PETERSON v DEPARTMENT OF NATURAL RESOURCES

OPINION OF THE COURT

1. ADMINISTRATIVE LAW—CIVIL SERVICE COMMISSION—APPEAL AND ERROR.

   The scope of review for an appeal from a decision of the Civil Service Commission is whether the decision is supported by competent, material and substantial evidence (Const 1963, art 6, § 28).

2. ADMINISTRATIVE LAW—CIVIL SERVICE COMMISSION—EMPLOYEE DISMISSAL—PSYCHIATRIC EXAMINATION.

   It is within the authority of a hearing officer of the Civil Service Commission to order a conservation officer, who appeals his dismissal for reasons of a mental or emotional condition which might be such as to jeopardize the public or the personnel of the Department of Natural Resources, to submit to an examination by a mutually agreeable psychiatrist or face affirmance of his dismissal, where there was a bona fide question as to the employee's mental fitness to serve as an armed conservation officer empowered by statute to make arrests (MCLA 300.11 *et seq.*).

DISSENT BY HOLBROOK, J.

3. APPEAL AND ERROR—CIVIL SERVICE RULING—MENTAL OR EMOTIONAL DISORDER—EVIDENCE.

   *A circuit court's finding, on an appeal from a Civil Service Commission decision, that a plaintiff's three visits to two psychiatrists and the reports by the psychiatrists that resulted from the visits would conclusively establish that the plaintiff had no instability whatsoever is, in effect, a finding that the hearing officer's conclusions were not based on competent, material, and substantial evidence where the Civil Service*

REFERENCES FOR POINTS IN HEADNOTES
[1, 2] 2 Am Jur 2d, Administrative Law § 546; 4 Am Jur 2d, Appeal and Error § 144.
[3] 4 Am Jur 2d, Appeal and Error § 144.
[4] 16 Am Jur 2d, Constitutional Law § 351.

*Commission decision was that there was substantial reason to suspect that the plaintiff might have a serious mental or emotional disorder, and the circuit court's decision that plaintiff employee was improperly discharged was a proper one where the report of a third psychiatrist merely stated the psychiatrists inclination to diagnose plaintiff as having a personality disorder, and where plaintiff vigorously disputed the third psychiatrist's qualifications.*

4. CONSTITUTIONAL LAW—RIGHT TO PRIVACY—PSYCHIATRIC EXAMINATION—COMPELLING EVIDENCE.

*A Civil Service Commission hearing officer's determination that because of a plaintiff's refusal, on the advice of his counsel, to reveal to his superiors the contents of the report of his voluntary visit to a psychiatrist there was substantial reason to suspect that there might be a serious emotional or mental problem is erroneous because it ignores the fact that no one in government has a right to force an employee to divulge reports about him taken, in private, voluntary psychiatric examinations; the employee has a constitutional right of privacy.*

Appeal from Alpena, Philip J. Glennie, J. Submitted Division 3 March 7, 1973, at Lansing. (Docket No. 13984.) Decided May 23, 1973. Leave to appeal granted, 390 Mich 765.

A grievance was filed with the Civil Service Commission by Richard G. Peterson against the Department of Natural Resources for reinstatement and back pay for wrongful dismissal. Reinstatement and back pay denied. Plaintiff appealed to the Alpena Circuit Court. Reversed. Defendant appeals. Reversed and remanded.

*Jason, Kowalski & Pugh,* for the plaintiff.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Roderick T. MacGillis,* Assistant Attorney General, for the defendant.

Before: DANHOF, P. J., and HOLBROOK and BASHARA, JJ.

DANHOF, P. J. Defendant, Department of Natural Resources, appeals from a judgment of the Circuit Court of Alpena County reinstating plaintiff as an employee of the department with full back pay and fringe benefits to the date of his dismissal. This judgment reversed a decision by the Civil Service Commission which affirmed the Department of Civil Service hearing officer's decision sustaining the dismissal of plaintiff.

Plaintiff served as a conservation officer from April 25, 1966, until his dismissal on August 8, 1969. The series of events leading to his dismissal began on January 3, 1969, when plaintiff submitted a game-law prosecution report which was criticized by his superior in a memorandum dated January 8, 1969. Plaintiff objected to the memorandum and in particular to the words: "If you are to be a successful conservation officer you are going to have to be more tolerant and stop feeling that everyone is against you". Plaintiff requested through his union representative a conference with a view toward having this memorandum removed from his file. The conference was held on March 5, 1969. The record reflects disagreement between the parties as to what occurred. Defendant contends that plaintiff voluntarily offered to consult a psychiatrist for the purpose of establishing his mental fitness. Plaintiff contends that this offer was not voluntary, but rather his only recourse in disproving what he considered to be an attack on his mental stability. After approximately two weeks had elapsed, defendant inquired of plaintiff concerning his announced intention to see a psychiatrist. Plaintiff then filed his first departmental grievance requesting removal of the memorandum from his file and a transfer. Plaintiff then saw a psychiatrist of his own choice on April

2, 1969. A hearing was held on April 29, 1969, on plaintiff's first grievance. Plaintiff announced that he had seen a psychiatrist and had a report, but declined to submit it on the advice of counsel. When no decision from this hearing was forthcoming on June 2, 1969, plaintiff filed an appeal with the Department of Civil Service. On June 4, 1969, plaintiff filed his second departmental grievance, complaining of defendant's failure to answer his first grievance within two working days. On June 13, 1969 defendant issued a decision on grievances 1 and 2 denying the request for removal of the memorandum, tabling the request for a transfer, and ordering plaintiff to be examined by a psychiatrist to be selected by the Department of Civil Service. A psychiatric examination was scheduled and plaintiff was notified on June 23, 1969. Only plaintiff was aware that the psychiatrist selected by the Department of Civil Service was the same Dr. Ali Guner consulted earlier by plaintiff. On June 26, 1969, plaintiff filed an appeal with the Department of Civil Service from defendant's decision. Plaintiff was examined by Dr. Guner on July 8, 1969, and on July 29, 1969, Dr. Guner reported to defendant concerning this second consultation after plaintiff had signed an information release. In part the report states: "I was inclined to diagnose Mr. Peterson as having personality disorder-paranoid personality. People who suffer from this condition require psychiatric help."

On August 6, 1969, a meeting was held in Lansing with plaintiff, his union representative, and officers of the Department of Natural Resources in attendance. Plaintiff was advised that in view of Dr. Guner's report, he could not continue as an armed conservation officer; he was offered a lateral transfer to another position within the department

as water safety officer at the same seniority and pay. If he refused the transfer, he would be discharged. The new position would require a move to Lansing. Plaintiff accepted the transfer position on August 7, 1969, but retracted acceptance the following day. A report of separation issued on August 8, 1969. Shortly thereafter, plaintiff filed his third grievance, complaining of his discharge. A hearing was held on August 26, 1969, at which time plaintiff presented to his superiors for the first time the first psychiatric report of Dr. Guner. Plaintiff was denied reinstatement and back pay, but was given the alternative of a further psychiatric examination which would determine plaintiff's eventual reinstatement or continued dismissal. Plaintiff chose instead to appeal defendant's decision to the Department of Civil Service. Before a hearing could be had, plaintiff unilaterally consulted two other psychiatrists of his own choice on three occasions.

On December 9, 1969, a hearing was held before the Department of Civil Service hearing officer, James R. McCormick. Reports of all three psychiatrists were received into evidence at the hearing. Plaintiff's first two grievances were dismissed; his separation was upheld and back pay and benefits denied. Another psychiatric examination was ordered which, if favorable to plaintiff, would entitle him to reinstatement; terms and conditions for mutual agreement on the selection of a psychiatrist were provided; refusal to submit to such an examination would result in affirmance of dismissal.

On February 2, 1970, plaintiff appealed the hearing officer's decision to the Civil Service Commission. Full hearing was had and on May 1, 1970, decisional letters were issued by the commission affirming the hearing officer's decision.

On May 19, 1970, plaintiff filed a claim of appeal in the Circuit Court of Alpena County, predicating jurisdiction on the 1952 Administrative Procedures Act, 1952 PA 197; MCLA 24.101 *et seq.;* MSA 3.560(21.1) *et seq.* We note in passing that as of that date, *Viculin v Department of Civil Service,* 386 Mich 375 (1971), was not yet decided. Likewise as of that date the 1969 Administrative Procedures Act, 1969 PA 306; MCLA 24.201 *et seq.;* MSA 3.560(101) *et seq.,* had not yet replaced the 1952 act. In view of the confusion present in the law before *Viculin,* we are of the opinion that the circuit court did not lack jurisdiction to review this matter under the 1952 act. See *Viculin,* 386 Mich 375, 396 footnote 20.

The judgment of the court below dated March 23, 1972, can be quoted as follows:

"It is ordered and adjudged that the Department of Civil Service Commission's decision affirming the decision of the hearing officer of the department is not supported by competent, material and substantial evidence and it is further ordered and adjudged that the plaintiff, Richard G. Peterson, be immediately reinstated to his original position of Conservation Officer 90 [09] at Harrisville, Michigan, with full back pay and all fringe benefits from the date of his dismissal by the Department of Natural Resources.

"It is further ordered and adjudged that the plaintiff is to be given every opportunity to determine any alleged emotional fitness for the conservation officer's position if the Department of Natural Resources still desires this alleged question to be ultimately determined, although while any alleged emotional fitness question is being ultimately determined, plaintiff is to be reinstated."

Per *Viculin, supra,* the scope of review for the trial court, and for this Court, is whether the decision of the Civil Service Commission is sup-

ported by competent, material, and substantial
evidence. Const 1963, art 6, § 28. The hearing
officer's decision affirmed by the Commission was
based on competent, material, and substantial evi-
dence. Read as a whole, that decision was a mea-
sured and understanding response to what had
already become a very knotty problem. We quote
from the record:

"This case touches on the issue of the right to privacy
in our increasingly nonprivate world. Certainly we
want to avoid a situation in which the state govern-
ment can arbitrarily subject employees to psychiatric
examination. Such a power could lead to abuses and
corruption. On the other hand the government cannot
be prohibited from necessary precautionary actions
where it has substantial cause to believe that an em-
ployee may be dangerous to the public or jeopardizing
the interests of fellow employees. The question then
becomes whether the Department had substantial cause
to believe that Peterson's mental or emotional condition
might be such as to jeopardize the public or the person-
nel of the Department. This in effect is a rule of
common sense or what might be referred to as the
'common law of the shop'.
"At the outset there was no reason to believe that
Peterson had any emotional problems. However, the
matter gained momentum like a snowball going down
hill, with increasing reason to believe that there was a
problem. When Peterson refused to reveal the contents
of the report obtained from his own psychiatrist, offi-
cials of the Department, I find, had substantial reason
to suspect that there might be a serious emotional or
mental problem. When they finally had the report from
Dr. Guner, indicating that Peterson had a paranoid
personality, they were no longer free to ignore the
problem. To permit a deputized conservation officer, one
who has the authority to apprehend persons and to
carry a firearm, to continue to perform his duties in the
field despite a strong reason to believe that he might
have a serious paranoia, would be the utmost of irre-
sponsibility. This is true despite the fact that the De-

partment made no attempt at the hearing held by me to establish that Peterson's conduct as an officer was erratic or that he in fact was overly critical or inclined to feel persecuted. The only evidence was the report from the psychiatrist, but it was rather telling evidence. "Despite the above I find that the reports obtained by Peterson from two independent psychiatrists are so favorable to him as to justify further investigation into his situation. Such an obviously outstanding conservation officer should not be lost to the State through misunderstandings concerning his rights with respect to psychiatric examinations, or because of his failure to cooperate with one psychiatrist. Peterson refused to take a transfer to a safety officer position, but this was consistent with his character as a dedicated public servant who has a single-minded desire to pursue a career in conservation. Accordingly, it is quite understandable that he would not accept a transfer which he felt would effectively shut him out of his chosen field.

"Peterson failed to take the opportunity to have further psychiatric consultation shortly after his discharge. The Department's answer to his discharge grievance proposed the selection of a second psychiatrist and Peterson did not follow up on that. However, in view of the developments at the hearing and the presentation by Peterson of favorable psychiatric reports, including a diagnostic study by one of the psychiatrists, I believe that the interests of the state service would be best served if Peterson were given another opportunity to establish his emotional soundness."

Plaintiff was given complete access to his employment file with the department. Evidence favorable to the plaintiff was carefully weighed. Plaintiff's employment records with the Department of Natural Resources and earlier with the Department of Social Welfare, Schoolcraft County, were most satisfactory. Plaintiff produced two psychiatric reports which cast some doubt on the diagnosis of Dr. Guner. However, the utility of the report by Dr. Bedwell was in issue because of plaintiff's

failure to disclose to Dr. Bedwell the fact that he had been a conservation officer and had been discharged. He indicated to Dr. Bedwell that he desired a report because he was seeking employment as a conservation officer.

The hearing officer refused to consider evidence that plaintiff had had some difficulties while in the military. Likewise, evidence of resentment by plaintiff of administrative supervision when employed as a teacher was rejected as not relevant to the issue of plaintiff's fitness for the position of conservation officer. The content of a follow-up conversation between plaintiff's superiors and Dr. Guner was not admitted into evidence.

However, the hearing officer did realize that plaintiff's superiors were not given the opportunity to examine any other reports except Dr. Guner's report of July 29 at the time that plaintiff was separated from the department, and that the content of this report would cast serious doubts in the mind of any reasonable man as to plaintiff's mental fitness to serve as an armed conservation officer. Finally, the hearing officer's decision that plaintiff was not entitled to reinstatement and back pay, but should be afforded an additional opportunity to demonstrate his mental fitness, was consistent with the fact that plaintiff was discharged only after he refused the lateral transfer to the position of water safety officer.

Plaintiff asserts that neither the Department of Natural Resources nor the Civil Service Commission had the power to compel him to submit to a psychiatric examination under Rule 10:18 or any other of the rules of the Civil Service Commission; that it was error for the hearing officer to justify his order by reference to a "common law of shop". In *Michigan Civil Service Commission v Local*

*1342, AFSCME, AFL-CIO,* 32 Mich App 104 (1971), we were faced with action by the commission which was not only unauthorized by its rules, but also contrary to its stated policy. In the instant case, Rule 1.1 provides that separation shall be based upon merit, efficiency, and fitness. We are, therefore, not prepared to hold that the hearing officer or the commission exceeded their authority when they ordered plaintiff to submit to an examination of a mutually agreeable psychiatrist or face affirmance of his dismissal. In the instant case, there was a bona fide question as to plaintiff's mental fitness to serve as an armed conservation officer empowered by statute to make arrests. MCLA 300.11 *et seq.;* MSA 13.1221 *et seq.* The potential risks not only involve the possible use of a firearm, but extend as well to the civil and constitutional rights of persons arrested and charged with game-law violations.

The judgment of the circuit court is reversed and the decision of the Civil Service Commission is affirmed. However, since plaintiff was within his rights in appealing the commission's decision, the 30-day period for the selection of a mutually agreeable psychiatrist should be reinstated so as to give plaintiff an opportunity to demonstrate his mental fitness at this time.

Reversed and remanded for further proceedings not inconsistent with this opinion.

No costs, a public question being involved.

BASHARA, J., concurred.

HOLBROOK, J. *(dissenting).* I must dissent. At the time of his dismissal plaintiff had served over three years as a conservation officer. Of the plaintiff's employment record the civil service hearing officer stated:

"In any event, I make an affirmative finding that Peterson's prior record of employment, both with his Department and with another Department, have been exemplary. His file contains laudatory statements which would be the envy of any employee anywhere. One official went so far as to suggest that Peterson was among the top two out of approximately 100 employees in a similar capacity. His record is one of extreme efficiency and intelligence and dedication of duty. He has no prior record of difficulty in getting along with fellow employees and there have been no incidents of his abusing the public or having unsatisfactory relationships with the public. He has always received satisfactory ratings by his superiors and there is no indication of prior reprimands."

How could the plaintiff, in the hearing officer's very own words "an obviously outstanding conservation officer", be subject to discharge from his conservation position on grounds of mental instability? The circuit court found that "there is * * * no testimony in the record which would indicate an emotional instability except for the contrary findings of Dr. Guner who examined plaintiff Peterson on two separate occasions". I concur with that ruling. I am compelled to disagree with my brothers' conclusion that the hearing officer's ruling was based on competent, material, and substantial evidence because I interpret the facts differently than my brothers in the prevailing opinion.

This entire matter began when plaintiff received a memorandum from the DNR's District Law Supervisor, Bernard Morgan, reading as follows:

"Your recent prosecution report case history on Daniel Plenta is far too detailed. There are several statements made that do not pertain to the case and should have been left out. A prosecution report should not be used as a means of trying to get even with someone.

"If Officer Pyers refused to serve the warrant as you stated he too was wrong, however, this certainly should not be put in the case history.

"You have been overly critical of almost every situation and policy since you have been in this district. Apparently this was also true when you were in District 14.

"If you are to be a successful conservation officer you are going to have to be more tolerant and stop feeling that everyone is against you."

The story that unfolded thereafter is stated in the majority opinion. What is left out are the full opinions of Dr. Guner and the opinions of two other psychiatrists as to the mental stability of the plaintiff. Plaintiff twice visited Dr. Guner voluntarily on April 2, 1969, and on the orders of his superiors on July 8, 1969. Since the hearing officer considered the July 8, 1969, report "rather telling evidence" of plaintiff's instability, I believe both his reports are of sufficient significance to require their complete quotation.

The April 2, 1969, visit resulted in a report by Dr. Guner that read:

"Mr. Peterson is 30 years old, white, male patient; having no children and indicated to me that they are in the process of getting a divorce.

"Mr. Peterson was found to be neat and clean in his appearance, co-operative and accessible for the examination procedure, but he was rather tense, guarded and tends to become sarcastic as well as to use projection and denial under pressure. He, however, was alert, rational and his contact with reality was found reasonably within satisfactory limits. He displayed no evidence of distortion of affect. His orientation was correct, accompanied by cleared sensorium as well as satisfactory intellectual functions and intact memory.

"He volunteered to bring considerable amount of information on account of his experiences as well as his feelings. He indicated that he had a general discharge

from the Air Force after five months of service, because of his 'un-adaptability to military life.' He indicated, 'I fought to get out.'

"He stated that he went to college at Central Michigan University. He indicated that he was teaching for awhile and he had to leave that place because he stated that, 'I had personality conflict with the school superintendent while I was teaching.'

"His present complaint is related with his present job performance as well as his superiors who apparently, according to the patient, are putting pressure on him. He claimed that his problem began when he refused to work more than 40 hours a week without overtime pay, the way I understood, that he was being asked.

"He stated that he could not 'cut it' because his supervisor was not treating the officers the way he felt they should be treated. He stated that he was being accused of being paranoid, for which he is going to fight and prove that he is not.

"He indicated that Mr. Morgan who is the one that engineered those things needs psychiatric help himself and that he is not competent to supervise the people. He claimed that he can not get along with most of the personnel and there are four grievances against him. He further stated that his department is not functioning the way it should function. He indicated that his department is 'corrupt.' He stated that they are trying to get rid of him because the others would not fight with them the way he is fighting.

"Mr. Peterson did not display any evidence of depression nor did he express any depressive ideations. His psychomotor activity was found to be within normal limits. He did not appear to be having ideas of references. He denied ever having hallucinatory experiences, which also could not be elicited."

Dr. Guner did not conclude anything from this particular visit about plaintiff's stability.

The July 8, 1969, involuntary visit of plaintiff to Dr. Guner resulted in a report by Dr. Guner that read:

"Mr. Peterson appeared to be very neat and clean in his personal appearance with normal gait and posture. He seemed to have clear sensorium accompanied by intact memory as well as satisfactory intellectual functions.

"He, however, appeared to be extremely guarded, suspicious, hostile, rigid and defensive. He was tense, jittery, mildly apprehensive and anxious. He seemed to be resentful of the fact that he was requested to be seen for a psychiatric evaluation. He used a great deal of denial trying to convince me that he was not emotionally upset.

"His affect showed a moderate increase of anxiety but did not appear to be distorted. His speech was relevant and coherent but he was rather unproductive about his feelings because of being suspicious.

"He indicated that he was not going to discuss anything of his department as well as his relationship with his department. He indicated that he would like to find out if he is emotionally disturbed or not. He showed a great deal of resistance and sensitivity during the examination. He indicated that he had nothing to discuss with me without his attorney being present and stated, 'I don't believe this examination is justified.'

"He seemed to be restless from time to time and appeared to be under increased pressure. He tended to become more irritable, hostile and sensitive. He appeared to be self-centered and extremely concerned of self-importance.

"His relationship with me and our agency showed a great deal of sensitivity, resentment and hostility. He was unable to control these feelings and expressed them through his behavior.

"*I was inclined* to diagnose Mr. Peterson as having personality disorder—paranoid personality. People who suffer from this condition require psychiatric help." (Emphasis supplied.)

These reports seem to me to be neither so consistent nor such powerful evidence of plaintiff's mental instability to justify a serious questioning of plaintiff's competence. However, based on the

mere "inclination" of Dr. Guner in the July 8, 1969, report the civil service hearing officer concluded that the DNR was justified in finding that plaintiff had a serious emotional problem and in seeking an end to his conservation officer career. The hearing officer reached this conclusion "despite the fact that the Department made no attempt at the hearing held by me to establish that Peterson's conduct as an officer was erratic or that he in fact was overly critical or inclined to feel persecuted". Moreover, Dr. Guner himself, in a letter dated December 2, 1969, to the chief of Personnel of the DNR, written in response to the chief's questions as to whether or not plaintiff should be permitted to work as an armed conservation officer, stated, "I can only evaluate his condition and I cannot give a definite answer to the * * * question." Nowhere in his reports did Dr. Guner conclude that plaintiff was unstable. At best a professional judgment about plaintiff remained undetermined as evidenced by Dr. Guner's willingness to state that he was only "inclined" to find plaintiff paranoid. At the very most Dr. Guner's two reports seem to describe an angry civil servant highly displeased with the insertion of a critical work report into his until then sterling personnel record. Can we blame plaintiff if he appeared highly sensitive to criticism and highly sensitive to psychiatric probing under such circumstances? The hearing officer himself opined that the memorandum of plaintiff's superior that started this dispute, though justified, "contains overtones of a 'don't rock the boat' attitude on the part of the superior". It simply seems highly likely to me that if a person's sanity is questioned, and if his job performance is questioned despite an exemplary past work record, he is going to react with

dismay, suspicion, hostility, and be on the defensive, especially on occasions when he is involuntarily visiting a psychiatrist.

The weight and validity of Dr. Guner's analysis as evidence of plaintiff's instability appears even weaker when it is considered that plaintiff vigorously disputed the expert qualifications of Dr. Guner. Plaintiff also submitted reports of two psychiatrists that established that plaintiff was emotionally stable. Dr. Edgar, after an extensive analysis supplemented with clinical psychological testing, concluded that plaintiff was normal in every respect, but that:

"[H]e is very much involved with the circumstances surrounding his dismissal from his job and feels a deep injustice was done to him. He has indicated much preoccupation with this situation and he has shown some distrust and suspicion. *However, this may have a realistic base.*" (Emphasis supplied.)

Dr. Bedwell's report, the most extensive one before the reviewing officials below, aptly summed up the kind of person the DNR was dealing with:

"He relates directly and sincerely, has flexibility in humor. He appears to have normal judgment. He appears to be a strong-minded individual with a firm manner and definite convictions, capable of either rigidity or flexibility, appropriate to the situation."

The circuit court found that the plaintiff's three visits to these two psychiatrists and the reports that resulted from the visits "would conclusively establish that Peterson had no emotional instability whatsoever". This was in effect a finding that the hearing officer's conclusions were not based on competent, material, and substantial evidence. Had I been in the position of the circuit judge I certainly would have ruled likewise.

I do not find any fault with the idea that public servants who are given authority to arrest citizens and who are armed during their duties should be subject to psychological testing and temporarily assigned to duties not requiring the carrying of weapons when their superiors have valid reasons to believe they may be mentally unstable. Indeed, the idea that such armed officers be periodically tested is exemplary. However, the hearing officer concluded that simply because plaintiff refused to reveal to his superiors the contents of the report of his voluntary first visit to Dr. Guner that they "had substantial reason to suspect that there might be a serious emotional or mental problem". This ignores two crucial facts. First, no one in the DNR, or anywhere else in government, has a right to force plaintiff to divulge reports about him taken in private, voluntary psychiatric examinations. To suggest otherwise blatantly ignores plaintiff's constitutional right to privacy. Second, plaintiff refused to reveal the results of his first visit with Dr. Guner on the advice of counsel, and so informed his superiors. Plaintiff's refusal to divulge matters in his private life under these circumstances cannot be considered a substantial reason to question his emotional stability, contrary to the conclusion of the hearing officer.

The factual situation appears here to be a simple one. A public servant objects to a "don't rock the boat" reprimand placed in his until then outstanding personnel file and he is then told he is overly critical and later ordered to see a psychiatrist. The individual rights plaintiff asserts here are of such importance that they deserve a final determination before the highest court of this state. For, as the hearing officer himself stated, "Such an obviously outstanding conservation offi-

cer should not be lost to the State through misun-
derstandings concerning his rights with respect to
psychiatric examinations, or because of his failure
to cooperate with one psychiatrist".

I would affirm with costs to plaintiff.