PETERSON v DEPARTMENT OF NATURAL RESOURCES

OPINION OF THE COURT

1. ADMINISTRATIVE LAW—CIVIL SERVICE COMMISSION—CONSERVATION
   OFFICER—DEPARTMENT OF NATURAL RESOURCES—DISMISSAL—
   REINSTATEMENT—EVIDENCE.

   Conservation officer with the Department of Natural Resources
   should be reinstated where his dismissal on appeal to the Civil
   Service Commission is not supported by competent, material,
   and substantial evidence on the whole record.

2. ADMINISTRATIVE LAW—CIVIL SERVICE COMMISSION—CIVIL SERVICE
   COMMISSION RULES—SICK LEAVE—PSYCHIATRIC EXAMINATION—
   PHYSICIANS AND SURGEONS.

   A part of the "paid sick leave" section of the rules of the Civil
   Service Commission, which provides that "[a]n appointing au-
   thority may require that an employee present medical certifica-
   tion of his physical or mental fitness to continue working", does
   not grant authority to require a psychiatric examination where
   no question has been raised regarding paid sick leave benefits
   and it does not authorize the "appointing authority" to require
   an employee to submit to an examination by a doctor chosen by
   the appointing authority (Civil Service Commission Rule 10.16).

3. ADMINISTRATIVE LAW—STATE AGENCIES—CIVIL SERVICE COMMIS-
   SION—CIVIL SERVICE COMMISSION RULES.

   The promulgation of civil service rules is designed to prevent
   state agencies, and the Civil Service Commission itself, from
   exceeding their authority and acting arbitrarily; allowing sub-
   ordinate entities as they encounter specific situations to develop
   usages regarding fundamental matters, not formally promul-

REFERENCES FOR POINTS IN HEADNOTES
[1, 5–7] 15 Am Jur 2d, Civil Service §§ 41, 42.
[2] 15 Am Jur 2d, Civil Service § 30.
   Right of public officers or employees as regards "sick leave," 169
   ALR 476.
[3] 15 Am Jur 2d, Civil Service §§ 5–8.
[4] No reference.

gated, is inconsistent with the purpose of requiring advance rule making.

4. ADMINISTRATIVE LAW—CIVIL SERVICE EMPLOYEE—GRIEVANCE BOARD—GRIEVANCE—PSYCHIATRIC EXAMINATION.

A departmental grievance board should not have the authority to order a grievant to submit to a psychiatric examination; knowledge of such bizarre dispositions would "chill" the civil service employee's right to access to grievance machinery.

5. ADMINISTRATIVE LAW—CIVIL SERVICE EMPLOYEE—DISMISSAL—PSYCHIATRIC DIAGNOSIS—MENTAL GROUNDS.

The diagnosis of a psychiatrist which stated "I was inclined to diagnose Mr. Peterson as having personality disorder—paranoid personality" and that "[p]eople who suffer from this condition require psychiatric help", standing by itself, even if unrebutted or uncontradicted, is insufficient to sustain a dismissal of a civil service employee on mental grounds.

6. ADMINISTRATIVE LAW—PUBLIC EMPLOYER—PUBLIC EMPLOYEE—DISMISSAL—PSYCHIATRIC GROUNDS—PSYCHIATRIC REPORT—NOTICE —PHYSICIANS AND SURGEONS—HEARING.

Before a public employer may properly consider dismissing an employee on psychiatric grounds, a *complete* psychiatric report based on an intensive examination and, if necessary, clinical tests should be required and the report should relate its findings to the position held by the employee; if the doctor's report is adverse, the employee should promptly be apprised of it and the doctor should be produced at a hearing where he can be questioned by the employee or his counsel.

7. ADMINISTRATIVE LAW—CIVIL SERVICE EMPLOYEE—DISMISSAL—REVIEW—CIVIL SERVICE COMMISSION RULES—APPEAL AND ERROR— CIVIL SERVICE COMMISSION—EVIDENCE.

Acceptance of the argument, that the justification for dismissing a civil service employee is to be reviewed as of the time he was dismissed, would in many cases prevent a discharged civil service employee from proving that the discharge was unjustified and would unduly impair his right under a civil service rule to appeal to the Civil Service Commission from an "involuntary separation from employment without just cause"; moreover, the issue is not whether on the limited facts which may have come to the attention of the appointing authority dismissal was justified but, rather, whether on all the evidence, including facts of which the appointing authority may not have

become aware, the involuntary separation should be sustained (Civil Service Commission Rule 33.2).

CONCURRING OPINION

WILLIAMS, J.

See headnotes 1–7.

8. STATES—GOVERNMENT—EMPLOYEES—PSYCHIATRY.

*Government is to be encouraged to use modern science, including psychiatry, to meet its responsibilities to protect the public and to improve its service, while at the same time safeguarding the rights of individual employees and employee morale generally; it behooves management to work out some accommodation with its right and need to know with the employee's right and need not to be forever blackballed by the permanent inclusion in his personnel files of derogatory material involving subjective, unilateral and untested judgments.*

Appeal from Court of Appeals, Division 3, Danhof, P. J., and Holbrook and Bashara, JJ., reversing and remanding Alpena, Philip J. Glennie, J. Submitted May 10, 1974. (No. 14 May Term 1974, Docket No. 54,989.) Decided June 25, 1974.

47 Mich App 336 reversed.

Richard G. Peterson appealed to the Civil Service Commission from his dismissal from employment with the Department of Natural Resources. Dismissal affirmed. Plaintiff appealed to the Alpena Circuit Court. Reversed. Defendant appealed to the Court of Appeals. Reversed and remanded. Plaintiff appeals. Reversed and remanded to circuit court for further proceedings.

*Jason, Kowalski & Pugh,* for plaintiff.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Roderick T. MacGillis,* Assistant Attorney General, for defendant.

LEVIN, J. Richard G. Peterson seeks reinstatement with back pay as a conservation officer with the Department of Natural Resources (DNR).

The Civil Service Commission, adopting the opinion of a hearing officer, affirmed DNR's dismissal of Peterson. The Circuit Court of Alpena County reversed and ordered Peterson reinstated. A divided panel of the Court of Appeals reversed the circuit court and upheld DNR's dismissal of Peterson. 47 Mich App 336; 209 NW2d 511 (1973).

We reverse, again, and order reinstatement. Peterson's dismissal is not supported by competent, material, and substantial evidence on the whole record.[1]

I

Peterson was a conservation officer for two and a half years before this controversy began in early 1969. His duties necessitated that he carry a gun and arrest persons who violate the game laws. MCLA 300.16; MSA 13.1226.

The controversy had its genesis when Bernard Morgan, Peterson's District Law Supervisor, criticized him in a department memorandum for filing an overbearing report on a game violation. Morgan's memorandum, which was placed in Peterson's permanent file, concluded: "If you are going to be a successful conservation officer you are going to have to be more tolerant and stop feeling that everyone is against you."

Peterson objected and at a conference with department supervisors sought to have Morgan's

---

[1] *Viculin v Department of Civil Service,* 386 Mich 375; 192 NW2d 449 (1971), holds that the scope of review from a final decision of the Civil Service Commission is the constitutional standard, "whether the same are supported by competent, material and substantial evidence on the whole record." Const 1963, art 6, § 28.

memorandum removed from his file. There was no record made of this conference; what occurred is in dispute.

Peterson claims it was agreed that if he presented a statement from a psychiatrist that he was not suffering from a "persecution complex", the objectionable memorandum would be removed. He regarded his going to a psychiatrist as voluntary.

M. E. Southworth, Chief of DNR's Personnel Division, regarded Peterson's seeing a psychiatrist as mandatory. Two weeks after the conference he wrote requesting Peterson to supply, within a week, the name of the psychiatrist he was going to see and asking for a copy of the psychiatric report.

Peterson, then in the process of arranging such an appointment, regarded Southworth's time pressuring and mandatory language as negating their agreement and decided to abandon the agreement and instead, pursuant to department regulations, filed a written grievance requesting that Morgan's memo be removed and that he be transferred from Morgan's supervision.

In the meantime, unbeknownst to DNR, Peterson followed through with the psychiatric examination and was examined by Dr. Ali Guner. Guner wrote a one-page report which generally discusses his interview with Peterson; the report does not indicate a psychiatric problem. Guner's report also contained statements attributed to Peterson regarding DNR officials: "[Peterson] indicated that Mr. Morgan who is the one that engineered those things needs psychiatric help himself. * * * He indicated that his department is 'corrupt.' "

Southworth was the grievance hearing officer. At the grievance hearing, Peterson explained he had seen a psychiatrist but on the advice of counsel declined to submit the complete psychiatric

report. He offered to submit the "psychiatric evaluation portion of the report."

When the grievance board failed to decide this grievance, Peterson filed an appeal with the Civil Service Commission and then filed a second grievance with DNR asserting the failure to answer his first.

The grievance board's decision on the first grievance followed shortly thereafter. Besides withholding the relief Peterson had requested— removal of the memorandum and a transfer—the grievance board, in effect, initiated proceedings against Peterson. It ordered Peterson "to be examined by a psychiatrist selected by the Department of Civil Service to determine his fitness to continue employment as a Conservation Officer." If this test proved Peterson "mentally fit to continue as an Officer," he would be granted a transfer; if the examination showed Peterson "not mentally fit" this would be "a basis for separating [Peterson] from the Officer position."

Pursuant to this order, Peterson was examined by a psychiatrist selected by the Civil Service Commission, coincidentally, Dr. Guner. Guner's second report generally discussed Peterson's displeasure at being forced to submit to a second examination, and concluded: "I was inclined to diagnose Mr. Peterson as having personality disorder— paranoid personality. People who suffer from this condition require psychiatric help."

Peterson was apprised of this diagnosis at a meeting with Southworth and others. Southworth offered Peterson a choice—accept a lateral transfer (at the same level, pay and seniority) as a water safety officer (a "desk" job which necessitated moving to Lansing) or be separated from DNR.

Peterson at first accepted the water safety posi-

tion, but the next day changed his mind and filed his third grievance, this time against his discharge. In an effort to rebut Guner's second report, Peterson produced Guner's first report at the hearing on the third grievance. This grievance was decided against Peterson and he then sought review by the Civil Service Commission.

At a hearing conducted by a Civil Service Commission hearing officer, DNR produced Guner's second report. Guner did not testify.[2]

Peterson produced three psychiatric reports from two psychiatrists (neither was present at the hearing) whom he had visited subsequent to his discharge. Dr. Irving Edgar's report was favorable to Peterson, stating in part:

"He was orientated as to time, place and person. He was not depressed. He showed no undue anxiety. There was no evident obsession or compulsions, and no phobias. He expresses no hallucinations or delusions. He is not psychotic."

These "impressions" of Dr. Edgar were confirmed by subsequent clinical psychological testing: "[Peterson] is not psychotic."

Peterson also produced an extensive four-page report by Dr. William Bedwell which similarly concluded: "Diagnosis: No psychiatric disorder."

Peterson additionally presented letters from the Michigan State Medical Society indicating that Drs. Edgar and Bedwell, but not Dr. Guner, were "board-certified psychiatrist[s]" requiring "several years of advanced study in the field of psychiatry and serv[ing] a residency."

---

[2] Southworth testified that he and other personnel officers had personally discussed Peterson's situation with Guner and were reinforced in their belief that their action was proper. The Civil Service Commission hearing officer excluded this testimony as hearsay.

Several fellow DNR employees testified praising Peterson's professional dedication and competence. Peterson submitted numerous DNR service ratings and other documents from DNR and his previous employment experiences similarly praising his work.

In evaluating Peterson's work habits the hearing officer made "an affirmative finding that Peterson's prior record of employment both with [DNR] and with another Department have been exemplary. His file contains laudatory statements which would be the envy of any employee anywhere. One official went so far as to suggest that Peterson was among the top two out of approximately 100 employees in a similar capacity. His record is one of extreme efficiency and intelligence and dedication to duty. *He has no prior record of difficulty in getting along with fellow employees and there have been no incidents of his abusing the public or having unsatisfactory relationships with the public.*" (Emphasis supplied.)

## II

Section 10 of the Rules of the Civil Service Commission concerns "paid sick leave". Rule 10.16[3] under that heading provides:

"Evidence of Fitness—An appointing authority may require that an employee present medical certification of his physical or mental fitness to continue working."

This rule does not grant authority to require a psychiatric examination where no question has been raised regarding paid sick leave benefits. Just as clearly it does not authorize the "appointing authority" to require an employee to submit to an

---

[3] Numbered 10.18 at the time of the hearing.

examination by a doctor chosen by the appointing authority.

The promulgation of civil service rules is designed to prevent state agencies, and the Commission itself, from exceeding their authority and acting arbitrarily. Allowing subordinate entities as they encounter specific situations to develop usages regarding fundamental matters, not formally promulgated, is inconsistent with the purpose of advance rule making.

In limited circumstances it may be appropriate for a state agency to require an employee to submit to a psychiatric examination as a condition of continued employment. The procedures for requiring such an examination should, however, be formalized and published as a civil service rule.

Before promulgation of such a rule, it would be necessary to address and resolve important policy questions. Who is to make the initial determination of whether a particular employee must submit to an examination? What raises a "bona fide question" (the Court of Appeals' term) or constitutes "substantial cause" (the hearing examiner's term) to suspect a mental problem? The character and scope of the psychiatric examination? Who is to analyze the data and opinion obtained from the psychiatrist?

These basic policy questions, as the instant case illustrates, are too complex to be left to the ad hoc discretion of persons who may themselves be involved in the controversy or who may easily be overwhelmed by the semantics of psychiatry.

Further, a departmental *grievance* board should not have the authority to order a grievant to submit to a psychiatric examination. Knowledge of such bizarre dispositions would "chill" exercise of the employee's right to access to the grievance machinery.

## III

The grievance board's order requiring a mental examination was predicated on seven grounds which, it is asserted, put in question Peterson's mental fitness:

"(1) It appears he resents being supervised.

"(2) It appears he resents having to operate within administrative policies and procedures.

"(3) It appears that both items (1) and (2) were evident during his previous employment with the Littlefield Public School System and with the Department of Social Services.

"(4) The possibility that this problem of inability to adapt to policies and procedures existed during his short service with the Air Force: (served from 7-18-56 to 11-5-56 and given an honorable discharge under Regulation AFR 39-16, Paragraph 4a, item 4, and not eligible for reenlistment).

"(5) His apparent tendency to consistently misinterpret statements in memoranda (Morgan's memo of January 9, 1969, and Southworth's memorandum of March 19, 1969).

"(6) His apparent tendency to misinterpret meanings of words (Peterson's memo of March 24, 1969 to Southworth).

"(7) His apparent tendency to misinterpret statements by supervisory personnel, including statements made by Bennett, Morgan and Southworth during March 6, 1969 meeting at Roscommon Regional Office."

Grounds (1), (2), (5), (6) and (7) all relate to Peterson's differences with his supervisors and the filing of his grievance. Generally, when a grievance is filed there has been a misunderstanding and different emphases placed on words or actions. If people did not disagree concerning the meaning of words and actions there would be little need for a grievance system.

Ground (3) refers to Peterson's employment experience with the Department of Social Services and the Littlefield Public School System.

Walter Minor, Director of Schoolcraft County, Department of Social Welfare, concluded an evaluation of Peterson in April, 1966: "I do not hesitate to most highly recommend Mr. Peterson to any potential employer and I consider his leaving our agency a real loss."

In 1964, five years before Peterson's alleged paranoia, the superintendent of the Littlefield school system had written that Peterson "was not suited to the life of an educator" and "consistently resented administrative policies." This bears no relevance to his mental stability in 1964, and most certainly is not probative of his mental reliability as a conservation officer.

The circumstances of Peterson's separation from the military service (ground [4]) were not brought out at the hearing.

## IV

DNR's dismissal is grounded on Dr. Guner's second psychiatric evaluation: "I was inclined to diagnose Mr. Peterson as having personality disorder—paranoid personality. People who suffer from this condition require psychiatric help."

This diagnosis standing by itself, even if unrebutted or uncontradicted, is insufficient to sustain the dismissal of an employee on mental grounds.

Although "only" Peterson's *job* is technically involved in this litigation, in essence his entire career is at stake. The black mark which DNR has imposed on Peterson's employment status is a stigma not easily removed or overcome. Many employers would be most wary to employ a person

who has previously been terminated for having a "paranoid personality."

Dr. Guner spent less than an hour with Peterson at the second examination. He conducted no clinical tests. His conclusion is far from definitive. He did not explain the significance of his terms or findings in the context of Peterson's employment.

Before a public employer may properly consider dismissing an employee on psychiatric grounds, a *complete* psychiatric report based on an intensive examination and, if necessary, clinical tests should be required. The report should relate its findings to the position held by the employee. If the doctor's report is adverse, the employee should promptly be apprised of it. The doctor should be produced at a hearing where he can be questioned by the employee or his counsel.[4]

In this case, there was no evidence whatsoever that Peterson had ever misused his authority. The reports of the other psychiatrists, the testimony and reports of Peterson's fellow officers, the record of Peterson's exemplary work experience clearly outweigh whatever probative value may be attributed to Guner's evaluation.

## V

DNR contends that Drs. Edgar's and Bedwell's reports and the other evidence adduced by Peterson at the Civil Service Commission hearing may

[4] If the employee offers the testimony of witnesses, expert or non-expert, opposing the public employer's evidence, they too would, of course, be subject to cross-examination.

DNR complains that it did not have an opportunity to speak to Peterson's expert witnesses before they examined him and made their evaluation. The civil service hearing procedure might appropriately provide for prehearing depositions, particularly of expert witnesses. But affording a public employer an opportunity to speak to witnesses, apart from a deposition procedure, is not a precondition to the employee's putting in a defense.

not be considered. It asserts that the justification for dismissing Peterson is to be reviewed as of the time he was dismissed.

Acceptance of this argument would in many cases prevent a discharged civil service employee from proving that the discharge was unjustified and would unduly impair his right under civil service rule 33.2 to appeal to the Civil Service Commission from an "involuntary separation from employment without just cause".

The issue on appeal to the Civil Service Commission is not whether on the limited facts which may have come to the attention of the appointing authority was dismissal justified but, rather, whether on all the evidence, including facts of which the appointing authority may not have become aware, should the involuntary separation have been sustained.

The Court of Appeals is reversed and the cause is remanded to the Alpena County Circuit Court for the entry of an order reinstating Peterson with back pay as determined by the circuit court.[5]

T. M. Kavanagh, C. J., and T. G. Kavanagh, Swainson, Williams, M. S. Coleman, and J. W. Fitzgerald, JJ., concurred with Levin, J.

Williams, J. *(concurring).* My Brother Levin has written a perceptive and understanding opinion with which I concur completely. I add these few words of exegesis only as a footnote out of almost forty years of experience in "the system".

Government management in a case such as this

---

[5] Peterson's refusal to accept a lateral transfer does not bar his recovery of back pay. All wages in fact earned by Peterson shall be deducted from the back pay award. The record presented on the other aspects of the mitigation issue is not sufficiently developed to warrant an expression from this Court.

has a critical responsibility both to the public and to the individual employee. Government is to be encouraged to use modern science, including psychiatry, to meet its responsibilities to protect the public and to improve its service, while at the same time safeguarding the rights of individual employees and employee morale generally. The Department of Natural Resources is to be commended in recognizing a new and useful management tool to serve the public. However, in this particular instance, as my Brother LEVIN ably brings out, there wasn't a concomitant recognition of the rights of its own employees, especially in connection with the employment of a science not yet fully understood or commonly accepted by the public. The common reaction to the requirement of a "regular" medical examination on the one hand and a psychiatric examination on the other is altogether different. As long as this is so, personnel practices must recognize this reality. Understandingly and diplomatically employed, psychiatry could have been in this instance both a safeguard to the public and of assistance to all the employees involved.

One additional word. My Brother LEVIN cogently pointed out that "[a]lthough 'only' Peterson's job is technically involved [in trying to expunge the objectionable memorandum] in this litigation, in essence his entire career is at stake." Even without the far flung possibilities of dissemination of personnel information via computerization, it behooves management to work out some accommodation with its right and need to know with the employee's right and need not to be forever blackballed by the permanent inclusion in his personnel files of derogatory material involving subjective, unilateral and untested judgments. All too often

when it comes to subsequent promotion or hiring opportunities, these negative unilateral, untested and subjective judgments outweigh an overwhelmingly preponderant and tested record of excellence. As a consequence, not only fairness to the individual but public service efficiency requires some adequate method of handling such items. At some point, with so much at stake, due process inevitably enters.