### Robert P. SMITH

v.

### James R. SCHLESINGER, Secretary of Defense, et al., Appellants.

### No. 74–1440.

United States Court of Appeals, District of Columbia Circuit.

Argued October 24, 1974.

Decided May 15, 1975.

Rehearing Denied July 21, 1975.

---

464

Larry L. Gregg, Atty., Dept. of Justice, with whom Henry E. Peterson, Asst. Atty. Gen., Edward S. Christenbury and Benjamin C. Flannagan, Attys., Dept. of Justice, were on the brief for appellants.

William G. Ohlhausen, Washington, D. C., for appellee.

Before BAZELON, Chief Judge, McGOWAN, Circuit Judge, and MERHIGE,* District Judge for the Eastern District of Virginia.

Opinion for the Court filed by Chief Judge BAZELON.

BAZELON, Chief Judge.

Robert P. Smith, an aerospace engineer, required a "Secret" security clearance from the Department of Defense to begin his employment at Dunlap & Associates of Santa Monica, California. Smith had held a "Secret" clearance at his two previous places of employment. On April 11, 1966, one week before Smith was to begin his work with Dunlap & Associates, the Industrial Security Clearance Review Office (ISCRO) of the Department of Defense advised Smith that his "Secret" clearance had been immediately suspended because of Smith's failure to meet Criterion R, Part IV of DOD Directive 5220.6.[1] This Criterion

forbids the grant of any security clearance to a person suffering from

[any] illness, including any mental condition, of a nature which, in the opinion of competent medical authority, may cause significant defect in the judgment or reliability of the employee, with due regard to the transient or continuing effect of the illness and the medical findings in such case.

The Statement of Reasons accompanying the ISCRO letter of April 11 identified Smith's illness as a mental condition variously diagnosed as "schizophrenic reaction, unclassified", "paranoid schizophrenic reaction" and "manic depressive reaction, mixed." Of these diagnoses, more will be said below.

Pursuant to procedures established in Part VII of Directive 5220.6, Smith was given an administrative hearing before a Hearing Examiner of the Central Industrial Personnel Access Authorization Board. On June 1, 1967, Hearing Examiner Joseph Sacks determined that Smith's mental condition did not meet the requirements of Criterion R and that Smith was therefore entitled to his "Secret" clearance.[2] Previously, on November 16, 1966, Dunlap & Associates began employment of Smith on a special interim basis. The Department of Defense counsel appealed the Examiner's decision to the Appeal Section of the Central In-

---

* Sitting by designation pursuant to 28 U.S.C. § 292(d).

1. 32 C.F.R. § 155.5(r) (1974). This Criterion is subject to the general policy stated in Part III(a), (e), 32 C.F.R. § 155.4(a), (e) which mandates that a security clearance "shall be granted or continued only to those individuals who have been determined eligible based upon a finding that to do so is clearly consistent with the national interest" and that "the ultimate determination must be an overall common sense one based upon all the information which may properly be considered under" the Directive.

   Directive 5220.6 was issued under the charter of Exec.Order 10865, 25 Fed.Reg. 1583 (1960) which in turn was issued to comply with the mandate of Greene v. McElroy, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959). The program has been considered and applied in the following cases: Gayer v. Schlesinger,

160 U.S.App.D.C. 172, 490 F.2d 740 (1973); Adams v. Laird, 136 U.S.App.D.C. 388, 420 F.2d 230 (1969), cert. denied, 397 U.S. 1039, 90 S.Ct. 1360, 25 L.Ed.2d 650 (1970); Clifford v. Shoultz, 413 F.2d 868 (9th Cir.), cert. denied, 396 U.S. 962, 90 S.Ct. 426, 24 L.Ed.2d 426 (1969), rev'g Shoultz v. McNamara, 282 F.Supp. 315 (N.D.Cal.1968); McNamara v. Remenyi, 391 F.2d 128 (9th Cir. 1968); Silver v. McNamara, 111 U.S.App.D.C. 334, 296 F.2d 591 (1961); Dick v. United States, 339 F.Supp. 1231 (D.D.C.1972). *See also* Schneider v. Smith, 390 U.S. 17, 88 S.Ct. 682, 19 L.Ed.2d 799 (1967); Cafeteria & Restaurant Workers v. McElroy, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961); McBride v. Roland, 369 F.2d 65 (2d Cir. 1966), vacated and remanded, 390 U.S. 411, 88 S.Ct. 1111, 19 L.Ed.2d 1271, on remand, 405 F.2d 1057 (1968).

2. In re Robert Paul Smith, No. OSD 66–47 (West. Field Office June 1, 1967).

dustrial Personnel Access Authorization Board. On November 8, 1967, the Appeal Board reversed the Hearing Examiner and revoked Smith's "Secret" clearance originally granted in 1958.[3] On November 27, 1967, Dunlap & Associates terminated Smith's interim employment. On October 23, 1969, Smith sought reconsideration of this decision by again applying to ISCRO for a "Secret" clearance. On November 2, 1970, Smith was notified that this request was denied. Smith did not attempt to obtain the benefit of the hearing procedures of Directive 5220.6 in regard to this denial of reconsideration.[4] Smith alleges that he has been unable to gain employment in his chosen profession, from November 27, 1967, to date, as a result of the denial of a "Secret" security clearance.

On November 17, 1970, Smith filed suit in the federal district court for the District of Columbia charging that the denial of his security clearance in particular and Directive 5220.6 in general were unconstitutional, were not authorized by statute and were otherwise arbitrary and capricious. In the course of pre-trial proceedings, Smith moved for production under Fed.R.Civ.P. 34 of the investigative file compiled by ISCRO staff personnel in formulating the initial decision to deny the security clearance. The Department of Defense objected to this request, arguing that since the court could not review the decision to deny Smith's clearance except on the basis of the administrative record, the investigative file, allegedly not in the administrative record, was legally irrelevant to the court's review task. Smith joined issue on this point. The District Court ordered the Department of Defense to produce the investigative file for *in camera* inspection. The Department then interposed a claim of Executive Privilege and refused to produce the file. The District Court again ordered the Department to produce file for *in camera* inspection. The Department again declined to produce the file, sought reconsideration of the second order to produce and moved the District Court to certify the question for interlocutory appeal.[5] The District Court denied reconsideration but certified the question to this Court, which on January 26, 1972, denied leave to file the interlocutory appeal.[6] Upon Smith's motion, the District Court then imposed sanctions under Fed.R.Civ.P. 37(b)(2) on the Department for its refusal to comply with the discovery order.[7] Upon subsequent cross motions for summary judgment, the District Court on May 25, 1972, granted Smith's motion and entered judgment in his favor.[8] The Department of Defense appeals from this order.[9]

The District Court granted Smith's motion for summary judgment upon a finding that Smith's denial of a

---

3. In re Robert Paul Smith, No. OSD 66–47 (Appeal Board Nov. 8, 1967).

4. Smith was denied reconsideration by the Screening Board, see 32 C.F.R. § 155.7(a) (1974), the same body which had originally suspended his clearance. The Screening Board issues a statement of reasons upon reaching a determination that an individual should be denied a security clearance. Upon receiving the statement of reasons, the applicant may then follow the hearing and appeal procedures mandated by 32 C.F.R. § 155.7(b)–(f) (1974). In his first confrontation with IS-CRO, Smith had elected to utilize the hearing procedures but upon reconsideration did not so elect.

5. See 28 U.S.C. § 1292(b) (1970); Groover, Christie & Merritt v. LoBianco, 119 U.S.App.D.C. 50, 336 F.2d 969 (1964).

6. Laird v. Smith, Misc. 3737 (D.C.Cir. Jan. 26, 1972), denying certification from Smith v. Laird, Civil No. 3386–70 (D.D.C. Dec. 23, 1971).

7. Smith v. Laird, Civil No. 3386–70 (D.D.C. March 14, 1972).

8. Smith v. Laird, Civil No. 3386–70 (D.D.C. May 25, 1972).

9. The Department failed to file its appeal within the sixty day period required by Fed.R. App.P. 4(a) and the District Court denied the Department's motion for an extension of time to file the appeal. Smith v. Laird, Civil No. 3386–70 (D.D.C. Sept. 8, 1972). This Court reversed that order. Smith v. Laird, 160 U.S. App.D.C. 149, 489 F.2d 1273 (1974). *See also* Expeditions Unlimited Aquatic Enterprises v. Smithsonian Institute, 163 U.S.App.D.C. 140, 500 F.2d 808 (1974).

security clearance was arbitrary and capricious, holding that there was no evidence in the formal record of any relationship between Smith's mental condition and a defect in his judgment or reliability. This finding was based upon Smith's allegations in his Complaint at ¶ 23(f) which, under the Rule 37(b)(2) sanctions imposed upon it, the Department could neither deny nor contradict through introduction of evidence. The imposition of these sanctions, assuming for the moment the validity of order upon which they were based, was a permissible exercise of discretion.[10] It surely follows from the imposition of the sanctions that Smith is entitled to summary judgment.[11] The Department's main contention on this appeal is that the order requiring *in camera* inspection is itself invalid and not authorized by Rule 34 which, by reference to Fed.R. Civ.P. 26(b), permits only the discovery of "any matter, not privileged, which is relevant to the subject matter involved in the pending action . . .." The Department contends both that the investigative file is not relevant to Smith's suit and that the file is privileged. Since the discovery order here was only for *in camera* inspection, the Department further contends that Smith has not

shown the degree of necessity it argues is required in order to subject a claim of privilege to *in camera* scrutiny.

In its initial decision, the District Court failed to state reasons to support its determination that the ISCRO investigative file could be relevant to Smith's suit and of sufficient necessity to order *in camera* inspection despite the claim of Executive Privilege. Therefore, on January 9, 1975, this Court remanded the record of the case for supplementation as to the District Court's reasons for a finding of relevancy.[12] The District Court duly has advised us of his reasons and they are as follows:[13]

a. That the departmental counsel representing the Government at the hearing posed questions to witnesses that had their basis in information to which plaintiff had been denied access.

b. That witnesses at the hearing were allowed access to information in the investigative file to which plaintiff had not been allowed access, and that these witnesses testified to conclusions based on that information.

c. That the investigative file contains prior statements of witnesses who

---

**10.** The "preclusion" sanction employed by the District Court is properly employed against a willful violation of a discovery order. The government's refusal to comply with the District Court's order is clearly willful. *See* Fed. R.Civ.P. 37(b)(2); Dorsey v. Academy Moving & Storage, Inc., 423 F.2d 858, 860 (5th Cir. 1970); Von der Heydt v. Kennedy, 112 U.S. App.D.C. 78, 299 F.2d 459, 462, cert. denied, 370 U.S. 916, 82 S.Ct. 1554, 8 L.Ed.2d 498 (1962). *See also* General Dynamics Corp. v. Selb Mfg. Co., 481 F.2d 1204, 1211 (8th Cir. 1973), cert. denied, 414 U.S. 1162, 94 S.Ct. 926, 39 L.Ed.2d 116 (1974); Bon Air Hotel, Inc. v. Time, Inc., 376 F.2d 118 (5th Cir. 1967), cert. denied, 393 U.S. 859, 89 S.Ct. 131, 21 L.Ed.2d 127 (1968); Gill v. Stolow, 240 F.2d 669 (2d Cir. 1957); Sher v. DeHaven, 91 U.S.App.D.C. 257, 199 F.2d 777 (1952), cert. denied, 345 U.S. 936, 73 S.Ct. 797, 97 L.Ed. 1363 (1953). If the government complies with the District Court's order, a different situation would be presented.

**11.** We are not impressed with the government's suggestion that even under the District Court's sanction, it may rely on the adminis-

trative record to prove a rational basis for the denial of Smith's clearance. We think the District Court's sanction contemplated that the government could assert no material in support of its claim that Smith's clearance was denied for permissible reasons. The District Court's entry of default judgment is conclusive evidence that this was its view of the sanction. Our affirmance is predicated on an awareness that the preclusion sanction here is virtually equal to entry of default judgment.

**12.** Smith v. Schlesinger, 166 U.S.App.D.C. 205, 509 F.2d 538 (1975). *See* Von der Heydt v. Rogers, 102 U.S.App.D.C. 114, 251 F.2d 17 (1958). This was necessary because the District Court is delegated a good deal of discretion in making discovery orders and enforcing them with sanctions. *See* Vac-Air, Inc. v. John Mohr & Sons, 471 F.2d 231, 234 (7th Cir. 1973); Baker v. F & F Investment, 470 F.2d 778 (2d Cir. 1972), cert. denied, 411 U.S. 966, 93 S.Ct. 2147, 36 L.Ed.2d 686 (1973).

**13.** Smith v. Schlesinger, Civil No. 3386–70 (D.D.C. March 20, 1975), at 3–4.

testified at the hearing which related to their testimony and that he was denied access to these statements and therefore he could not effectively cross-examine those witnesses with respect to their testimony.

d. That the investigative file contains material that is favorable to the plaintiff and the non-production of that material prejudiced plaintiff in the presentation of his case, thus violating principles of fundamental fairness and due process.

e. That the administrative proceedings were brought in bad faith and for purposes other than his alleged mental illness.

We affirm. We initially set out in detail the administrative proceedings which led to the denial of Smith's clearance. On the basis of this discussion, we proceed to analyze the District Court's reasons for the determination of relevancy. We conclude these reasons are sufficient to support the order requiring *in camera* inspection. Our mandate affirming default judgment against the government will issue in the regular course, twenty days from the date of this opinion, unless the government complies with the order requiring *in camera* inspection.

## I. *The Administrative Proceedings*

The Department's case against Smith consisted entirely of the reports of five doctors and the testimony under oath, subject to cross-examination, of three of those doctors. Of these five doctors, one was a general practitioner not trained in psychiatry and the other four were trained in psychiatry but were not certified by the American Board of Psychiatry and Neurology. Smith presented no expert witnesses on his behalf and conducted his own defense, stating on the

record that he could not afford an attorney.[14]

We consider first the reports of the doctors who did not testify. The first is Dr. James S. L. Jacobs. Smith consulted with Dr. Jacobs in 1950 while he was in attendance at the California Institute of Technology. Smith complained of fears of people, headaches, speech difficulty, and inability to awake in the morning. He was hospitalized twice in 1950 under Dr. Jacob's care at Veterans Administration hospitals in the Los Angeles area where he received insulin coma therapy and attendant psychotherapy. Smith testified that the pressure of his graduate work caused these symptoms.[15] Dr. Jacobs diagnosed Smith as "schizophrenic reaction, unclassified." Dr. Jacobs did not state an opinion concerning the effect of this mental condition upon Smith's judgment or reliability. The second report was that of Dr. Bryce R. Bednar. Smith consulted Dr. Bednar between August and October of 1964, twice a week. Dr. Bednar noted the following symptoms: lack of interest, slowing down of ability, increased irritability and suspicion coupled with a depressed and agitated mood. Dr. Bednar's diagnosis was depressive reaction associated with a paranoid state. However, in Dr. Bednar's opinion, this mental condition would *not* cause a serious defect in Smith's judgment or reliability.

The general practitioner who testified for the Department was Dr. John D. Granzella, whom Smith consulted in January of 1964 in regard to an intestinal disorder. Dr. Granzella did not conduct a psychiatric examination of Smith but nevertheless diagnosed acute paranoid schizophrenia[16] on the basis of two facts. The first did not relate to Smith at all but rather was contained in a hospital

14. *Cf.* Bell v. Wayne County Gen. Hospital, 384 F.Supp. 1085, 1092–94 (E.D.Mich.1974) and authorities cited; Lynch v. Baxley, 386 F.Supp. 378, 389 (M.D.Ala.1974). *See also* Morrissey v. Brewer, 408 U.S. 471, 497–99, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) (Douglas, J. dissenting); In re Ballay, 157 U.S.App.D.C. 59, 482 F.2d 648 (1973).

15. I Hearing Tr. at 132–35.

16. II Hearing Tr. at 16. On his report submitted to the Department of Defense, Granzella had originally typed in "acute" but later crossed out that word and in pencil substituted the word "chronic."

report which the Hearing Examiner found belonged to one Robert *L.* Smith and which Granzella mistakenly attributed to applicant Robert P. Smith.[17] The other fact was Smith's statement in a telephone conversation with Granzella to the effect that Smith intended to move because he thought someone was following him. In his written report, Granzella also mentions the fact that Smith believed someone had been giving him an involuntary dose of LSD but does not state this was a basis for his diagnosis. Despite this diagnosis, Granzella did not recommend hospitalization because he thought Smith was engaged in psychotherapy, although he was not sure at the time of this fact and never consulted the psychiatrist whom Smith was in fact consulting. In his written report Granzella did not state an opinion on the effect of this diagnosed mental condition on Smith's judgment or reliability but under cross-examination did state that Smith fell within the intendment of Criterion R.[18] This opinion was based on the symptoms previously discussed.

The two main witnesses for the Department were Dr. Raymond C. Spaulding and Dr. George J. Prastka. We consider first the testimony and report of Dr. Prastka whom Smith consulted in March and April of 1964. The major complaint Smith related to Dr. Prastka was his belief that someone was covertly drugging him with LSD. Smith also gave Prastka a type-written list of "symptoms".[19] On the basis of these complaints, Dr. Prastka diagnosed Smith as an acute paranoid schizophrenic, severe but in partial remission. Dr. Prastka also felt that this mental condition would cause a significant defect in Smith's judgment or reliability. How-

ever, Dr. Prastka did not think that Smith should be hospitalized and believed he was responsible enough to take his own medicine. This course of action was inconsistent with Prastka's written statement that Smith was not "capable of assuming any degree of responsibility."[20]

The heart of the Department's case was the testimony of Dr. Spaulding whom Smith consulted once on October 1, 1965, at the request of the Department of Defense. Dr. Spaulding diagnosed Smith as suffering from manic depressive reaction, mixed, with a tendency to remission and recurrence. His mental condition in Dr. Spaulding's opinion could cause a serious defect in Smith's judgment or reliability. Spaulding testified that Smith was largely in remission at the time of his examination and that a diagnosis could not be made on the basis of one visit.[21] He furthermore did not conduct physical or mental tests on Smith, such as an EEG, IQ test or the normal battery of psychological tests. Dr. Spaulding's diagnosis then rests solely upon his examination of Smith's psychiatric record and Smith's statement of symptoms.

From this history, Dr. Spaulding identified certain characteristics in Smith's personality. At times of depression, Smith would "lose interest in things, he had a lack of ability to initiate goals, his ability to concentrate was poor, he had a lowered sexual drive, he had some disturbance of his sleep pattern and appetite . . . ."[22] At times of "hyperactivity", Smith "acted in an aggressive, hostile sort of fashion; he was associating with a group of individuals that were different from his usual friends

---

17. In re Robert P. Smith, No. OSD 66–47 (Western Field Office June 1, 1967), at 5 (mimeo).

18. II Hearing Tr. at 32.

19. This extraordinary document contains a list of various complaints ranging from a reduced need for sleep to a "propensity toward bizarre behavior." The symptoms are stated in a somewhat conclusory form. They were appar-

ently the basis for a large portion of the psychiatric boilerplate in Dr. Prastka's report. *See* the discussion at II Hearing Tr. at 90–95.

20. *See* II Hearing Tr. at 72–75. The quoted statement is contained in Dr. Prastka's written report.

21. I Hearing Tr. at 45, 57.

22. *Id.* at 35–36.

. . . and they were engaged in anti-social, or types of behavior which is not ordinarily looked upon in favor by the rest of the community."[23] Dr. Spaulding also noted Smith's belief that someone had been giving him an involuntary dose of LSD. Dr. Spaulding relied most heavily on this "hyperactive" stage in his opinion that Smith's mental condition could cause a serious defect in his reliability of judgment:[24]

> [In] the hyperactive period in particular the individual usually utilizes very, very poor judgment with regard to the conduct of his life and in his associations, in his activities and in his use of monies . . . .

In regard to the probability that Smith would again have another hyperactive period, Dr. Spaulding stated:[25]

> I have no opinion; I left my crystal ball at home. I do not like to predict the future for anybody. I can only tell you about the normal cause of the illness, and that this illness is prone to recurrences of both low and high periods. He may go for a hundred years and never have a deviation of either variety, but I cannot predict that he won't have one next week either. So I do not know.

There is no other testimony in the record on the probability of a recurrence of Smith's "hyperactive" period.

Dr. Spaulding was not sanguine about the possibility of treatment ensuring against recurrence but did state that then recent (circa 1966) literature highly praised the potential of lithium carbonate treatment.[26] Since that time lithium carbonate has received a great deal of favorable attention in medical journals.[27] Other than Dr. Spaulding's statements there is no other discussion in the record of the possibilities of lithium carbonate treatment for Smith.

Smith in his own defense did not seriously rebut Spaulding's list of symptoms but rather sought to establish that these symptoms and whatever mental condition they represented would not cause a significant defect in his judgment and reliability. To that end he introduced a number of letters from co-workers and examined at the hearing a few other co-workers. With the exception of some discussion of Smith's tardiness in arriving for work, all those who sent letters or testified stated that during Smith's hyperactive and depressed periods, his work was not affected. The Department did not attempt to rebut this presentation. Smith also sought to challenge

---

**23.** Id. at 36. Dr. Spaulding also had this to say about Smith's associations:

> The associates that he had at that time were interested in, and I may be formulating an opinion or prejudice, but they were showing many, many self-centered acts, and they all seemed to be individuals who collected together, but really what I gathered, they were all really only interested in themselves, and they were so-called creative people, usually artists and writers, and this sort of thing, who were intellectuals. Mr. Smith used the words "kook crowd", as he referred to them, and that was put in quotes in my report because I did not wish to be associated with formulating a value judgment about his friends. But some of them were ostensibly using drugs without benefit of prescription. It was this type of behavior that was going on.
>
> \* \* \* \* \* \*
>
> The departure from what we would consider normal behavior seemed to be relegated to the sphere of Mr. Smith's social contacts. I frankly do not know what he was

> doing professionally, and I had no need to know nor to inquire as to whether or not he was working on anything classified or not. But the problem was that he felt he was being given this drug, and he indeed was able to obtain a sample, he felt, of the drug to take and test . . . ., although the drug in itself can cause many different types of reactions in different people, and none of them predictable prior to taking the drug.

I Hearing Tr. at 37–39.

**24.** Id. at 46.

**25.** Id. at 53.

**26.** Id. at 41–42.

**27.** See, e. g., Lazare, Hidden Conceptual Models in Clinical Psychiatry, 288 New Eng. J. Med. 345, 348 (1973); Baldessarini, Frequency of Diagnoses of Schizophrenia Versus Affective Disorders from 1944 to 1968, 127 Amer. J. Psychiat. 759, 762 (1970). See generally J. Schildkraut, Neuropsychopharmacology and the Affective Disorders (1970).

what he perceived to be an implied assertion that he was not loyal to the nation. The basis for this apparent perception was Government Exhibit 9 which consisted of a fairly lengthy interview between one Valerio Cortinovis, a Special Agent of the Office of Special Investigation (OSI) of the Air Force, and Smith. This interview reveals the Department's in depth knowledge of Smith's associations, many of which were decidedly "left-wing."

The Hearing Examiner found in favor of Smith. He relied heavily on the testimony of Dr. Spaulding, holding that it was more comprehensive and that Dr. Spaulding displayed "a more expert knowledge of mental disorders and the Applicant's illness than did Dr. Prastka, in his testimony, or the other psychiatrists whose analyses are recorded in their written reports."[28] As this statement and others indicate, the Hearing Examiner did not give weight to the testimony of Dr. Granzella. The Hearing Examiner also found that Smith had not demonstrated certain symptoms often associated with a schizophrenic reaction. Largely following Dr. Spaulding's testimony, the Hearing Examiner further found that (1) Smith was in remission and would not experience defects in judgment or reliability while in that state; (2) the dominant period in Smith's psychosis was the depressive; (3) Smith had experienced only one delineated hyperactive period; (4) a defect in judgment or reliability is more likely to occur in the hyperactive than in the depressive period; and (5) "it cannot be accurately determined how long Applicant may remain in a state of remission, and it is possible that he may remain in such state for the rest of his life."[29] While the Hearing Examiner concluded that Smith had a mental condition which could cause a significant defect in his judgment or reliability, an "over-all common sense evaluation of all the evidence . . . is still required in order to reach the ultimate determination of whether . . . a grant is clearly consistent with the national interest."[30] On that basis the Hearing Examiner concluded after mentioning eight considerations[31] that clearance of Smith at "Secret" level would be clearly consistent with the national interest.

The Appeal Board reversed. The Board noted that "stripped of its non-essentials" the fact remains that Smith suffered from a mental condition. This was, of course, conceded by Smith. The Board described in a number of points that the illness was "chronic" not "acute", relying on Dr. Granzella's testimony.[32] The Board appears to assume

28. In re Robert P. Smith, No. OSD 66–47 (Western Field Office June 1, 1967), at 11 (mimeo).

29. Id.

30. Id. at 13. See 32 C.F.R. § 155.4(a), (e)(1974).

31. These eight factors were as follows: (1) there was no evidence that Smith's lack of good judgment in associating with the "marijuana crowd" and in arriving late for work had affected his ability to safeguard classified information; (2) Smith would not suffer a significant defect in judgment or reliability in his depressive periods; (3) during the manic phase of his illness, Smith had "sufficient insight to note and record his symptoms . . . and to seek medical advice and treatment"; (4) "Suspiciousness was a symptom [demonstrated by Smith] in 1964; he reported his suspicions to agencies of the Federal Government . . . .; and it is probable that he would act in a similar manner in the future if security considerations were involved"; (5) to the extent Smith's mental condition was traceable to two previous marriages, his present marriage "is believed to bode well for his future emotional stability"; (6) Smith "displayed no visible evidence of mental illness" during the administrative proceedings in this case; (7) the record in this case "includes impressive evidence of good judgment, reliability, and professional competence"; and (8) Smith has in the past made "significant contributions to the nation's defense effort, and the further utilization of his talents and skills . . . would contribute further to the national interest." In re Robert P. Smith, No. OSD 66–47 (Western Field Office June 1, 1967), at 13–14 (mimeo).

32. In re Robert P. Smith, No. OSD 66–47 (Appeal Board Nov. 8, 1967), at 5 (mimeo): "The Applicant's argument that Dr. Granzella mistakenly attributed another Robert Smith's mental illness to him is well taken. We do

chronicity from the fact that Smith had been consulting psychiatrists since 1950, apparently concluding that the term "chronic" is not a medical term of art.[33] It should be noted that Dr. Prastka diagnosed Smith as "acute" and Dr. Spaulding, Dr. Bednar and Dr. Jacobs did not mention the issue. While the Board throughout refers to Smith's "defective judgment", it specifies only the incident involving LSD and the fact that Smith had experimented with LSD and marijuana while knowing that such experimentation was in the Board's view dangerous and against the law. The Board agreed with the Hearing Examiner that Smith's mental condition was within the intendment of the Criterion but disagreed that any further common sense inquiry could be made. It thus implicitly concluded that the diagnosis was the

not, however, find the Doctor's error to be materially prejudicial in that independent evidence of record amply supports Dr. Granzella's diagnosis not to mention the diagnoses of Drs. Prastka, Bednar and Spaulding."

33. *Id.*: "His judgment is defective because of his mental illness and its established history of distorting his sense of reality. The condition has existed since 1950 and is therefore chronic." *Compare* Adler, Current Concepts: Acute Psychosis, 291 New Eng. J. Med. 81 (1974). The record indicates that the only delusional episodes sustained by Smith, in the opinion of the government doctors, were the LSD incident and the incident in which Smith moved his home because he thought someone was following him. These incidents both occurred in 1964. Dr. Spaulding testified that the diagnosis of manic depressive reaction, mixed, could be made even if the patient suffered no delusions. I Hearing Tr. at 63.

34. *See* the statement quoted in note 33 *supra.* The Appeal Board also had this to say:

All six [sic] diagnoses alleged in the Statement of Reasons reflect the opinion of competent medical authorities that Applicant, at the time of diagnosis, suffered from a mental illness, psychosis. . . . Although a mental illness may manifest itself by varying symptoms at different times, no probative evidence is found of record upon which it reasonably may be concluded that Applicant's mental condition has substantively changed; i. e., classify it as you will, schizophrenic, depressive or manic-depressive reaction, it remains properly classified as a psychotic disorder. Establishment of the fact that competent medical authority is of the opinion that the Applicant has had and

central evidentiary fact weighing against Smith on the record.[34]

## II. *The Potential Relevancy of the Investigative File*

The Department's central argument is that review of administrative decisions regarding security clearances is limited to the administrative record.[35] Since the Department is willing to prove that neither the Hearing Examiner nor the Screening Board considered the investigative file in decision of Smith's case and that the file is not in the administrative record, the file is perforce irrelevant to review of the decision revoking Smith's clearance. We, of course, have no quarrel with this general principle, but it does not end our inquiry for two reasons. First, the test of relevancy for purposes of discovery under Fed.R.

continues to have a chronic mental condition, which may cause a significant defect in his judgment, is amply demonstrated by the probative evidence of record.

In re Robert P. Smith, No. OSD 66–47 (Appeal Board Nov. 8, 1967), at 6 (mimeo). There is no discussion in the Appeal Board opinion of evidence linking the symptoms upon which these diagnoses were based to the specific limited access jobs that Smith would be required to perform. We thus conclude that the diagnosis of "psychosis" was the basis for the Appeal Board decision.

As to the further statement that use of LSD and marijuana provide "additional evidence corroborative of defective judgment", *id.*, this appears to be based on Criterion P and not Criterion R. *See* 32 C.F.R. § 155.5(p), (r) (1974). *Cf.* Gueory v. Hampton, 167 U.S.App. D.C. 1, at 6, 510 F.2d 1222, at 1227 (1975) (Statement of Bazelon, C. J.).

35. *See* Polcover v. Secretary of Treasury, 155 U.S.App.D.C. 338, 477 F.2d 1223, 1226, cert. denied, 414 U.S. 1001, 94 S.Ct. 356, 38 L.Ed.2d 237 (1973); Schwartz v. Secretary of Treasury, 364 F.Supp. 344, 346 (D.D.C.1973). *See also* Williams v. Robinson, 139 U.S.App.D.C. 204, 432 F.2d 637, 642 (1970). This rule is not iron-clad. *See* Williams v. Robinson, *supra*, at 642 n. 17; Brown v. United States, 396 F.2d 989, 992–94, 184 Ct.Cl. 501 (1968). *See also* Nolen v. Schlesinger, 492 F.2d 787 (5th Cir. 1974); Sierra Club v. Hardin, 325 F.Supp. 99 (D.Alaska 1971); Krawez v. Stans, 306 F.Supp. 1230 (E.D.N.Y.1969). Under our view of the case, it is unnecessary for us to decide whether consideration of evidence outside the record is appropriate here.

Civ.P. 26(b)(1) is broader than the test for admissibility at trial, as the Rule specifically provides.[36] Hence, a party may discover information which is not admissible at trial if such information will have some probable effect on the organization and presentation of the moving party's case.[37] The issue, therefore, is not whether the investigative file is irrelevant simply because it is inadmissible, but rather whether it could be relevant to the presentation of Smith's case based on the administrative record.

■ Second, Smith's action in the District Court encompasses more than a review of the Department's decision to revoke his clearance. It concerns also an attack on the authorization and constitutionality of the procedures whereby that clearance was denied. As to this, judicial review must of necessity consider more than the formal administrative record. The Department argues that prior cases[38] have established the authority and constitutionality of Directive 5220.6. However, we think that these prior cases do not eliminate all potential questions of authorization or constitutionality, particularly when a clearance is denied on the basis of an alleged mental condition. As discussed below, we do not think that these remaining questions are so plainly frivolous that exercise of discovery in pursuit of Smith's claims

would not be justified.[39] In our determination of both the substantiality of Smith's claims and the potential relevance of the investigative file to his case, we defer to the reasoned judgment of the District Court, since we conclude that judgment is neither arbitrary or capricious.[40]

■ Turning first to the potential relevancy of the investigative file in the preparation of Smith's defense that the record is inadequate to sustain the denial of a clearance, we think the District Court reasonably concluded that the file might well be relevant to Smith's assertion that his dismissal was on the basis of "disloyalty" and not mental illness. In the record is the lengthy interrogation by Special Agent Cortinovis. The investigative file might well explain the basis for those questions and help provide the District Court with the necessary gloss to fully understand their significance in a military context. The fact that Smith himself introduced the Cortinovis interrogation is no reason for reaching a different result, since the introduction was Smith's response to what he perceived as an attack on his loyalty. This perception might, after examination of the investigatory file, turn out to be founded in fact. Furthermore, even if the Hearing Examiner and Appeal Board did not consider Smith's loyalty in mak-

---

36. "It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to discovery of admissible evidence." *See* Freeman v. Seligson, 132 U.S.App.D.C. 56, 405 F.2d 1326, 1335 (1968); Democratic Nat'l Comm. v. McCord, 356 F.Supp. 1394, 1396 (D.D.C.1973). We note, of course, that since the 1970 Amendments to Rule 34, there is no longer a requirement that the moving party demonstrate "good cause" for the production of documents. Thus, the discussion in *Freeman, supra* at 1336–37, is not applicable to this case.

37. "Clearly the 'relevance' standard was intended to permit discovery of materials useful in case preparation, though not directly admissible in evidence." 4 Moore's Federal Practise ¶ 26.55[1], at 113 (2d ed. J. Moore & J. Lucas 1974). *See* numerous authorities cited *id.* ¶ 26.56[4], at 169–79.

38. *See* sources cited note 1 *supra;* note 46 *infra.*

39. *See* Spier v. Home Ins. Co., 404 F.2d 896, 899 (7th Cir. 1968); Garland v. Torre, 259 F.2d 545, 551 (2d Cir.), cert. denied, 358 U.S. 910, 79 S.Ct. 237, 3 L.Ed.2d 231 (1958) (Stewart, J.); Humphreys Exterminating Co. v. Poulter, 62 F.R.D. 392, 393 (D.Md.1974). *Cf.* Carey v. Hume, 160 U.S.App.D.C. 365, 492 F.2d 631, 637–38, petition for cert. dismissed, 417 U.S. 938, 94 S.Ct. 2654, 41 L.Ed.2d 661 (1974).

40. *See* Huff v. N. D. Cass Co., 468 F.2d 172, 176–77 (5th Cir. 1972), mod. on other grounds, 485 F.2d 710 (5th Cir. 1973) (*en banc*); Humble v. Mountain State Construction Co., 441 F.2d 816, 819 (6th Cir. 1971); Swanner v. United States, 406 F.2d 716, 719 (5th Cir. 1969); De Wagenknecht v. Stinnes, 100 U.S. App.D.C. 156, 243 F.2d 413, 417, cert. denied, 355 U.S. 830, 78 S.Ct. 44, 2 L.Ed.2d 43 (1957); cases cited note 12 *supra.*

ing their determinations, the fact that the ISCRO screening board may have considered evidence of disloyalty in initially revoking Smith's clearance and in prosecuting that decision before the Access Authorization Board may itself be sufficient to taint the proceeding.[41] If the Department revoked Smith's clearance in part for reasons other than those presented to Smith, then under the Department's own regulations and under established doctrine, the revocation must be set aside.[42]

This potential issue of administrative "bad faith" folds into a more general issue, *viz.* that of distinguishing between a medical judgment of a mental illness and a social judgment about the desirability and acceptability of an individual's life style and associations. There are constitutional overtones to personal choices of associations and beliefs.[43] It is certainly arguable that Criterion R should not be construed to infringe upon this protected area of personal liberty absent a specific showing of an over-rid-

---

**41.** *Cf.* United States v. Falk, 479 F.2d 616 (7th Cir. 1973); United States v. Steele, 461 F.2d 1148 (9th Cir. 1972); United States v. Crowthers, 456 F.2d 1074 (4th Cir. 1972). *See also* United States v. Berrios, 501 F.2d 1207 (2d Cir. 1974).

The significance of screening staff action and its motivations may be seen in the statement of Dr. Louis Linn who has conducted a number of examinations of clearance applicants. Dr. Linn notes that if the psychiatrist recommends clearance "his opinion is rarely questioned, particularly if his rationale is clearly spelled out." Linn, Psychiatric Factors in Security Screening, 130 Am.J.Psychiat. 648, 651 (1973). According to data supplied by the Department of Defense in this litigation, only a small fraction of the total number of cases processed ever result in the issuance of a Statement of Reasons and only one-half to two-thirds of the cases in which Statements of Reasons are issued result in a hearing. Of those cases which do result in a hearing, approximately 55% culminate in affirmance of the Screening Board's determination.

These tables are taken from Replies to Plaintiff's Interrogatories, at 5, Smith v. Laird, Civil No. 3386–70 (D.D.C. filed June 4, 1971):

| Year | SOR's issued involving mental illness criterion | Total number of cases processed |
|---|---|---|
| 1964 | 38 | 657 |
| 1965 | 36 | 511 |
| 1966 | 48 | 564 |
| 1967 | 39 | 577 |
| 1968 | 133 | 728 |
| 1969 | 141 | 840 |

Presented below are figures relating to the number of cases in which hearings were held as the result of the issuance of a Statement of Reasons in "mental illness or condition" cases

for the years indicated. Statistics are not available for any additional years.

| Year | Hearings |
|---|---|
| 1964 | 25 |
| 1965 | 21 |
| 1966 | 24 |
| 1967 | 20 |

In those cases in which hearings were held, the following determinations were:

| Year | Clearance Granted | Clearance Denied |
|---|---|---|
| 1964 | 7 | 18 |
| 1965 | 8 | 13 |
| 1966 | 20 | 4 |
| 1967 | 6 | 14 |

Since the Screening Board motivations are relevant to Smith's case for the reasons stated in the text, discovery of the government's motivation is not proscribed by the Federal Rules of Civil Procedure. *Cf.* Smith v. Sperling, 354 U.S. 91, 77 S.Ct. 1112, 1 L.Ed.2d 1205 (1957); United States v. Procter & Gamble Co., 25 F.R.D. 485 (D.N.J.1959).

**42.** *See* Vitarelli v. Seaton, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959); Williams v. Robinson, 139 U.S.App.D.C. 204, 432 F.2d 637, 643–44 (1970); Scott v. Macy, 131 U.S.App. D.C. 93, 402 F.2d 644 (1968). *See also* United States v. Nixon, 418 U.S. 683, 696, 94 S.Ct. 3090, 3101, 41 L.Ed.2d 1039 (1974).

**43.** These derive from the First Amendment and have been affirmed in the context of government licensing and employment. *See* Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); Baird v. State Bar of Arizona, 401 U.S. 1, 91 S.Ct. 702, 27 L.Ed.2d 639 (1971); United States v. Robel, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967). *Cf.* Schneider v. Smith, 390 U.S. 17, 88 S.Ct. 682, 19 L.Ed.2d 799 (1968); Schware v. Board of Examiners, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957); Harmon v. Brucker, 355 U.S. 579, 78 S.Ct. 433, 2 L.Ed.2d 503 (1958).

ing governmental interest.[44] The issue thus becomes whether Smith's alleged mental illness was less a medical judgment than a social judgment about his beliefs and associates. Indeed, the Appeal Board appeared to rely heavily on Smith's associations as evidence of his mental illness.[45] Beyond the evidence of Smith's associations, the Board appeared to rely only upon the medical opinion present in the record. Evidence in the investigatory file possibly bearing on Smith's associations might well help Smith prepare an argument that the Appeal Board finding of mental illness was fatally infected with a social judgment about his associations.

▇ The District Court's other reasons concerned a potential right of discovery in the administrative proceedings that led to the revocation of Smith's clearance. This right of discovery encompasses both an interest in proper preparation of a defense and an interest in fair treatment of an accused party, the latter interest being analogous to the principle of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The investigative file would be the potential subject of such a right of discovery and its production would aid the District Court in determining whether, assuming such a right, its violation in Smith's case was prejudicial to his defense, and also whether as a general matter a failure to provide the file in administrative proceedings is either unauthorized or unconstitutional.

▇ We do not think such a right of discovery is defeated by present doctrine.[46] Indeed, we think the case law

---

**44.** Cf. Schneider v. Smith, 390 U.S. 17, 88 S.Ct. 682, 19 L.Ed.2d 799 (1968); Watkins v. United States, 354 U.S. 178, 77 S.Ct. 1173, 1 L.Ed.2d 1273 (1957).

**45.** See supra, 168 U.S.App.D.C. page ——, 513 F.2d page 469 & nn. 23, 33–34 supra. Cf. In re Robert P. Smith, No. OSD 66–47 (Appeal Bd. Nov. 8, 1967), at 3 (mimeo): "A most significant aspect of Applicant's illness, permeating many of his reported activities and conceptual formations, is the delusional quality of his thinking, with the concomitant failure to test and evaluate correctly external reality in certain spheres of his relations with others."

The literature concerning the impact of social value judgments on psychiatric diagnoses is immense. See, e. g., T. Szasz, Law, Liberty and Psychiatry, 178–225 (1963); S. Abramowitz, C. Abramowitz, C. Jackson & B. Gomes, The Politics of Clinical Judgments, 41 J. Consult. & Clin. Psychol. 385 (1973); Shah, Crime and Mental Illness: Some Problems in Defining and Labeling Deviant Behavior, 53 Mental Hygiene 21 (1969); Ennis & Litwack, Psychiatry and the Presumption of Expertise: Flipping Coins in the Courtroom, 62 Cal.L.Rev. 693 (1974). See also note 49 infra; Bazelon, Introduction to Forensic Psychiatry xiii-iv (G. Morozov & I. Kalashnik eds. 1970):

The danger in the Soviet system is its lack of an adequate mechanism to uncover and counter the professional and personal biases of expert witnesses. Our experience in this country strongly suggests that a forensic psychiatrist's testimony and recommendations may be influenced both by his profes-

sional orientation . . . and by his personal and political preferences. * * * We may not ignore the possibility of bias in favor of the government by state-employed psychiatrists, whether they be Americans or Russians. * * * An exclusive concern with the protection of society would seem to deprive the forensic psychiatrist of the objectivity claimed for him. . . . When a law-and-order fever sweeps the country as a political issue, for example, there is no way to confer immunity on psychiatrists. They are vulnerable both as men and as practitioners of a profession that is inherently concerned with socially defined norms.

The reality of these dangers may be seen in Seebach v. Cullen, 338 F.2d 663 (9th Cir. 1964) and Peterson v. Dep't of Natural Resources, 392 Mich. 68, 219 N.W.2d 34 (1974). To be sure, recent advances in somatic learning may eliminate the uncertainty surrounding the overlap of social and psychiatric judgments. See Kety, From Rationalization to Reason, 131 Am.J.Psychiat. 957 (1974). There is no evidence in the administrative record of tests designed to locate somatic symptoms or causes of Smith's alleged manic depressive illness.

**46.** We do not think the broad dictum in Moore v. Administrator, Veterans Administration, 155 U.S.App.D.C. 14, 475 F.2d 1283, 1286 (1973) to the effect that it "is well established that no right to a preliminary investigative file exists in administrative law" prevents consideration of a potential claim that Smith is entitled to view his investigative file prior to administrative proceedings. The authority for this dictum is Professor Kenneth Davis who in the

concerning the procedural protections in clearance revocation proceedings demonstrates an admirable sensitivity which could encompass a right of discovery.[47] Furthermore, the peculiar circumstances of a revocation based on an alleged mental illness, we think, requires special attention to procedural rights. As the record in this case and others like it [48] strongly suggest, conclusory psychiatric

cited work attacks the few cases which have denied access to an investigative file or denied discovery at the administrative level. His view that discovery should be permitted in administrative proceedings was followed by the Administrative Conference of the United States, K. Davis, Administrative Law Treatise § 8.15, at 392 (1970 Supp.), and other distinguished commentators. *See* Kaufman, Have Administrative Agencies Kept Pace with Modern Court-Developed Techniques against Delay?—A Judge's View, 12 Admin.L.Bull. 103, 115 (1959); Berger, Discovery in Administrative Proceedings: Why Agencies Should Catch Up With the Courts, 46 A.B.A.J. 74 (1960). For a discussion of the recommendations of the Administrative Conference, *see* Tomlinson, Discovery in Agency Adjudication, 1971 Duke L.J. 89, 125–33. *See also* Developments in Administrative Law—Discovery, 1970 Duke L.J. 149, 238–45. The liberal attitude toward discovery is represented in the more recent cases dealing with that subject. *See* NLRB v. Rex Disposables Div., 494 F.2d 588, 592 (5th Cir. 1974) and cases cited; Shively v. Stewart, 65 Cal.2d 475, 55 Cal.Rptr. 217, 421 P.2d 65 (1966). *But see* NLRB v. Interboro Contractors, Inc., 432 F.2d 854 (2d Cir. 1970), cert. denied, 402 U.S. 915, 91 S.Ct. 1375, 28 L.Ed.2d 661 (1971). *Compare* FCC v. Schreiber, 381 U.S. 279, 85 S.Ct. 1459, 14 L.Ed.2d 383 (1965) *with* Federal Maritime Comm'n v. Anglo-Canadian Shipping Co., 335 F.2d 255 (9th Cir. 1964). The actual holding of *Moore* is consistent with the attitude toward administrative discovery expressed in the more recent cases permitting discovery at the administrative level. As stated 168 U.S.App.D.C. on page ——, 513 F.2d on page 478 *infra,* the investigative file in *Moore* contained the hearsay statements of investigators who did not testify when the source of those statements did testify at the hearing. Of course, any statements of those witnesses in the investigative file would have been discoverable under the principle of Communist Party of United States v. Subversive Activities Control Bd., 102 U.S.App.D.C. 395, 254 F.2d 314 (1958); NLRB v. Adhesive Prod. Corp., 258 F.2d 403 (2d Cir. 1958); Great Lakes Airlines v. CAB, 291 F.2d 354, 364 (9th Cir.), cert. denied, 368 U.S. 890, 82 S.Ct. 143, 7 L.Ed.2d 89 (1961), which *Moore* itself recognizes.

**47.** *Cf.* Greene v. McElroy, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959); Dick v. United States, 339 F.Supp. 1231 (D.D.C.1972); Shoultz v. McNamara, 282 F.Supp. 315 (N.D. Cal.1968), rev'd, 413 F.2d 868 (9th Cir.), cert.

denied, 396 U.S. 962, 90 S.Ct. 426, 24 L.Ed.2d 426 (1969). *See also* Bell v. Burson, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971); Goldberg v. Kelly, 397 U.S. 254, 269–70, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); Willner v. Comm. on Character & Fitness, 373 U.S. 96, 105–06, 83 S.Ct. 1175, 10 L.Ed.2d 224 (1963); Van Bourg v. Nitze, 128 U.S.App.D.C. 301, 388 F.2d 557 (1967); Garrott v. United States, 340 F.2d 615, 169 Ct.Cl. 186 (1965); Bland v. Connally, 110 U.S.App.D.C. 375, 293 F.2d 852 (1961).

We do not think Arnett v. Kennedy, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974) forecloses inquiry into these issues. *See id.* at 164, 94 S.Ct. at 1649 (Powell & Blackmun, JJ. concurring). Other cases concerning clearance revocations have assumed the validity of present procedures and did not concern revocation on the basis of mental illness.

**48.** *See* Linn, *supra* note 38, at 649–51; Part I *supra.* There is almost no evidence in the record correlating Smith's symptoms allegedly indicating mental illness with specific failures of judgment which might lead to security breaches. There is no evidence of the sort of information Smith might be expected to safeguard or the types of risk of disclosure to which he would be subject. Dr. Spaulding alone gives some explanation of the manner in which manic depressive illness can affect one's judgment or reliability. The two types of errors he identifies are profligate expenditure of money (of which there is no evidence in the record) and bad judgment in one's associates. I Hearing Tr. at 35–39.

We, of course, have no disagreement with the proposition that the Department of Defense need not wait until an individual has already violated security regulations in order to find that individual unfit for security clearance. It need not even prove there is a clear and present danger that the individual "would" use confidential information in derogation of national security. Adams v. Laird, 136 U.S.App.D.C. 388, 420 F.2d 230, 238–39 (1969), cert. denied, 397 U.S. 1039, 90 S.Ct. 1360, 25 L.Ed.2d 650 (1970). However, this does not mean that there need be no proven relationship between the conduct held to be disqualifying and the duties which the individual must perform in a manner consistent with the national security. The foregoing discussion should not be viewed as an approval of the view that the absence of prior security breaches has no material relevance to the issue of whether an individual is entitled to a security clearance. *See generally* Gayer v.

opinion tends to dominate the Criterion R determination. We have criticized this expert dominance in other contexts and see no reason for not extending this concern to the present circumstances: in both cases, psychiatric judgments may disguise, wittingly or unwittingly, political or social biases of the psychiatrist; and excessive reliance on diagnoses will pre-empt the primary role of legal decision-makers.[49] For these reasons, there is a special need for procedural rules designed to promote the adversary process and to ensure that the factual basis of expert opinion is clearly and precisely delineated on the record.[50] Administrative discovery of investigative files arguably is a step in that direction. A further reason for providing more stringent procedural safeguards in cases involving mental illness is that a finding of mental illness is unfortunately seen by many as a stigma; thus to that extent such a finding deprives the individual of a greater degree of liberty than mere loss of employment.[51] The enlightened view is that

mental illness is a disease similar to any physical ailment of the body and a condition for which there should be no blame or stigma. But we cannot blind ourselves to the fact that at present, despite lip service to the contrary, this enlightened view is not always observed in practice. We thus conclude that the District Court was reasonable in determining that the investigative file was relevant to Smith's action within the intendment of Rule 26(b)(1).

■ The Department's assertion of Executive Privilege makes its case more plausible, but not by much. The showing of relevancy discussed above is the "preliminary showing of necessity"[52] which permits at least an *in camera* review to determine the propriety of the claim. The District Court after an *in camera* inspection is, of course, authorized to uphold the claim of privilege if proper under the applicable precedents. It may even deny discovery of the investigative file if the privilege is not appli-

Schlesinger, 160 U.S.App.D.C. 172, 490 F.2d 740, 749–50 (1973); Norton v. Macy, 135 U.S. App.D.C. 214, 417 F.2d 1161 (1969) and sources cited in these two opinions. And, as noted in note 1 *supra*, Criterion R by its terms presumes an overall common sense inquiry which requires consideration of more than medical diagnoses, particularly when those diagnoses are conclusory.

49. On this subject, *see* Washington v. United States, 129 U.S.App.D.C. 29, 390 F.2d 444, 447–57 (1967), mod., United States v. Brawner, 153 U.S.App.D.C. 1, 471 F.2d 969, 1003 (1972); Katz et al., Studies of the Diagnostic Process, 125 Am.J.Psychiat. 937 (1969); Meehl, Some Ruminations on the Validation of Clinical Procedures, 13 Am.J.Psychol. 102 (1959); Rosenhan, On Being Sane in Insane Places, 179 Science 250 (1973). *See also* United States v. Morgan, 157 U.S.App.D.C. 1975, 482 F.2d 786 (1973); Robinson v. United States, 136 U.S. App.D.C. 309, 420 F.2d 151 (1969), cert. denied, 397 U.S. 977, 90 S.Ct. 1095, 25 L.Ed.2d 272 (1970) (Statement of Bazelon, C. J.); Huckabee, Resolving the Problem of Dominance of Psychiatrists in Criminal Responsibility Decisions, 27 Sw.L.J. 790, 797–98 (1974); note 45 *supra*. Failure of a psychiatrist to completely disclose information about an individual's mental condition led to the imposition of liability in Hicks v. United States, 167 U.S. App.D.C. 169, 511 F.2d 407 (1975).

50. *See* Peterson v. Dep't of Natural Resources, 392 Mich. 68, 219 N.W.2d 34, 39 (1974). *Cf.* Jones v. Robinson, 142 U.S.App.D.C. 221, 440 F.2d 249 (1971); Williams v. Robinson, 139 U.S.App.D.C. 204, 432 F.2d 637 (1970); Dixon v. Jacobs, 138 U.S.App.D.C. 319, 427 F.2d 589, 597, 600–01 (1970); Board of Trustees of Placerville Union School Dist. v. Porini, 263 Cal. App.2d 784, 70 Cal.Rptr. 73 (1968).

51. *See* In re Ballay, 157 U.S.App.D.C. 59, 482 F.2d 648 (1973); Peterson v. Dep't of Natural Resources, 392 Mich. 68, 219 N.W.2d 34, 39 (1974).

52. Committee for Nuclear Responsibility, Inc. v. Seaborg, 149 U.S.App.D.C. 385, 463 F.2d 788, 792, cert. denied, 404 U.S. 917, 92 S.Ct. 242, 30 L.Ed.2d 191 (1971). *See* Freeman v. Seligson, 132 U.S.App.D.C. 56, 405 F.2d 1326, 1338–39 & n. 65 (1968); Nader v. Butz, 60 F.R.D. 381, 385 (D.D.C.1973). For reasons discussed in Nader v. Butz, *supra*, such *in camera* inspection is fully consistent with Environmental Protection Agency v. Mink, 410 U.S. 73, 88–93, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973). *See also* United States v. Nixon, 418 U.S. 683, 708–713, 94 S.Ct. 3090, 3107–10, 41 L.Ed.2d 1039 (1974); Nixon v. Sirica, 159 U.S. App.D.C. 58, 487 F.2d 700, 719–21 (1973).

cable, upon a showing that the protective order considerations of Fed.R.Civ.P. 26(c) should apply. However, we cannot prejudge these issues without *in camera* inspection or, indeed, without any representation at all as to the contents of the investigative file. We thus conclude that the District Court acted within the bounds of discretion in ordering disclosure for *in camera* inspection.

There is nothing in Moore v. Administrator, Veterans Administration, 155 U.S.App.D.C. 14, 475 F.2d 1283 (1973) which is inconsistent with our holding. That case affirmed the dismissal of certain nursing assistants for mistreating a patient and failing to report the incident. The court rejected the assertion that the Administrator's failure to call two investigators as witnesses at the dismissal hearing was grounds for reversal since the investigators had witnessed none of the events and could give only hearsay testimony and since all the witnesses who did have first hand knowledge of the relevant facts were called as witnesses. The Court rejected the claim for the report prepared by the investigators on the same ground, also noting that the request was in the context of the administrative hearing and that no provision for pre-trial discovery in administrative proceedings was in effect.

A concluding word is in order. This is our first exposure to the use of mental conditions to disqualify an individual from either government employment or a government license for private employment. There is every reason to believe that consideration of mental illness for government employment is a daily occurrence. In the area of security classifications alone, evidence in this record indicates that in 1969 one hundred and forty one individuals were officially presented with a Statement of Reasons denying a clearance on the basis of a mental condition.[53] Statistics compiled in 1971 by the National Institute of Mental Health indicate that 4 million Americans received mental health treatment in a private or organization setting.[54] Furthermore, the most reliable estimates are that more than 20 million citizens, 10 per cent of the population, suffer from some behavioral disorder. Use of behavioral science knowledge to ascertain those not qualified for government service thus raises issues of extremely wide impact. Our discussion in this opinion should not be interpreted as expressing or intimating any opinion on the merits of these issues or on the propriety of judicial intervention into agency attempts to confront them. We hold only that the investigative file in this case is sufficiently relevant to the issues described above to justify the District Court's order for *in camera* inspection. We thus affirm the entry of default judgment against the government, unless it complies with the District Court's order prior to the issuance of our mandate.

Affirmed.

---

**53.** *See* note 41 *supra.* The problems of employee discharges on the basis of psychiatric disability and of compulsory administration of psychiatric tests have been the subject of increasing litigation. *See* Stewart v. Pearce, 484 F.2d 1031 (9th Cir. 1973); In re Chipley, 448 F.2d 1234 (4th Cir. 1971); Board of Trustees of Placerville Union School Dist. v. Superior Court, 274 Cal.App.2d 377, 79 Cal.Rptr. 58 (1969); Alford v. Dep't of Educ., 13 Cal.App.3d 884, 91 Cal.Rptr. 843 (1970); Kochman v. Keansburg Bd. of Educ., 124 N.J.Super. 203, 305 A.2d 807 (Ch.Div.1973); Coriou v. Nyquist, 33 A.D.2d 580, 304 N.Y.S.2d 486 (1969); appeal den. 26 N.Y.2d 610, 309 N.Y.S.2d 1027, 258 N.E.2d 103 (1970); Anon. v. Board of Examiners, 65 Misc.2d 581, 318 N.Y.S.2d 163 (1970). For the standard of psychiatric health applied to federal employment generally, *see* Federal Personnel Manual Supp. 339–31, S1–3(5), at 3 (April 1974).

**54.** National Instit. of Mental Health, Patient Care Episodes in Psychiatric Services: United States, 1971, at Statistical Note 92 (1973). *See also* Sharfstein, Taube & Goldberg, Private Psychiatry and Accountability, 132 Am.J.Psychiat. 43, 45 (1975).